```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE SOUTHERN DISTRICT OF OHIO
 2                              AT DAYTON


 3     _____
                                          )
 4     MICHAEL POFFENBARGER,              )
                                          )
 5                     Plaintiff,         ) CASE NO. 3:22-cv-01-TMR
                                          )
 6                 -vs-                    )
                                          )
 7     HONORABLE FRANK KENDALL, et al.,   ) MOTION FOR PRELIMINARY
                                          ) INJUNCTION
 8                     Defendants.        )
       _____)
 9
                        TRANSCRIPT OF PROCEEDINGS
10                 THE HONORABLE THOMAS M. ROSE,
              UNITED STATES DISTRICT JUDGE, PRESIDING
11                 TUESDAY, FEBRUARY 22, 2022
                            DAYTON, OH
12
       For the Plaintiff:      THOMAS B. BRUNS, ESQ.
13                             Bruns, Connell, Vollmar & Armstrong
                               4555 Lake Forest Drive
14                             Suite 330
                               Cincinnati, OH  45242
15
                               CHRISTOPHER D. WIEST, ESQ.
16                             Attorney at Law
                               25 Town Center Boulevard
17                             Suite 104
                               Crestview Hills, KY  41017
18

19     For the Defendants:     ANDREW E. CARMICHAEL, ESQ.
                               CATHERINE M. YANG, ESQ.
20                             U.S. Department of Justice
                               1100 L. Street N.W.
21                             Washington, D.C.  20003

22     Also Present:  Second Lieutenant Colonel Michael Poffenbarger
                      Major Marc Nowak
23                    Karen Hecker

24

25
```



**INDEX OF WITNESSES**

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **PLAINTIFF'S WITNESSES** | | | | |
| **Michael Poffenbarger** | 5 | 21 | 39 | 43 |

\*    \*    \*    \*    \*

**INDEX OF EXHIBITS**

| **PLAINTIFF'S** | **ADMITTED** |
|---|---|
| 1 - 8 | 46 |

\*    \*    \*    \*    \*

Proceedings recorded by mechanical stenography,
transcript produced by computer.

Mary A. Schweinhagen, RDR, CRR
Federal Official Court Reporter
200 West Second Street
Dayton, OH  45402
\*\*\* \*\*\* \*\*\* \*\*\*

| | | |
|---|---|---|
| 10:10:58 | 1 | P-R-O-C-E-E-D-I-N-G-S 10:10 A.M. |
| 10:10:58 | 2 | THE COURT:  Good morning, everyone. |
| 10:11:02 | 3 | Counsel, to start off, this is not my normal courtroom, |
| 10:11:08 | 4 | so I may be a little bit out of the water too.  So hopefully |
| 10:11:15 | 5 | you'll be able to hear everything I have to say and I will be |
| 10:11:19 | 6 | able to hear everything you have to say. |
| 10:11:20 | 7 | We're before the Court this morning in the matter of |
| 10:11:26 | 8 | Poffenbarger versus Kendall, and this is Case No. 3-22-cv-1. |
| 10:11:35 | 9 | And we're here for the purposes of a preliminary injunction |
| 10:11:42 | 10 | hearing. |
| 10:11:42 | 11 | Would counsel enter their appearance for the record. |
| 10:11:45 | 12 | MR. WIEST:  Good morning, Your Honor.  Chris Wiest |
| 10:11:47 | 13 | and Rob Bruns for the plaintiff. |
| 10:11:50 | 14 | MR. BRUNS:  Good morning, Your Honor. |
| 10:11:50 | 15 | THE COURT:  And you have Mr. Poffenbarger with you? |
| 10:11:52 | 16 | MR. WIEST:  We do, Your Honor. |
| 10:11:53 | 17 | THE COURT:  Thank you very much. |
| 10:11:53 | 18 | Counsel? |
| 10:11:54 | 19 | MR. CARMICHAEL:  Yes, Your Honor.  Andrew |
| 10:11:58 | 20 | Carmichael, Department of Justice, for defendants. |
| 10:12:01 | 21 | MS. YANG:  And Catherine Yang also with the |
| 10:12:03 | 22 | Department of Justice. |
| 10:12:06 | 23 | MR. CARMICHAEL:  I also have an agent and counsel |
| 10:12:07 | 24 | from the Department of Defense, Ms. Hecker; and from the Air |
| 10:12:09 | 25 | Force, Major Nowak. |

| | | |
|---|---|---|
| 10:12:10 | 1 | THE COURT:  Good morning.  Good morning. |
| 10:12:15 | 2 | Counsel, it's my understanding from our pre-hearing, or |
| 10:12:20 | 3 | pre-hearing discussion in chambers that there is -- there is a |
| 10:12:26 | 4 | witness to be presented, I believe Mr. Poffenbarger, and then |
| 10:12:28 | 5 | the Court will entertain any arguments with regard to the |
| 10:12:36 | 6 | issues before the Court and this preliminary injunction. |
| 10:12:40 | 7 | So with that, Counsel. |
| 10:12:43 | 8 | MR. WIEST:  Good morning, Your Honor.  We'd like to |
| 10:12:46 | 9 | call first Lieutenant Mike Poffenbarger to testify. |
| 10:12:52 | 10 | THE COURT:  All right. |
| 10:12:54 | 11 | **MICHAEL JERRY POFFENBARGER, PLAINTIFF'S WITNESS, SWORN** |
| 10:13:04 | 12 | THE COURT:  One further thing, counsel.  I have no |
| 10:13:12 | 13 | objection, and if counsel at counsel tables has no objection |
| 10:13:19 | 14 | and they are comfortable, you may lower or remove the masks. |
| 10:13:26 | 15 | Usually, what I try to do is limit any lowering of the masks |
| 10:13:32 | 16 | to questioning or when you are being spoken to. |
| 10:13:35 | 17 | Counsel, I am going to ask you to just keep your voice up |
| 10:13:38 | 18 | because you're right here and, I don't know, in close |
| 10:13:42 | 19 | proximity of my court reporter, and so we're going to ask you |
| 10:13:45 | 20 | to keep the masks on or everyone who approaches the podium |
| 10:13:48 | 21 | keep the mask on. |
| 10:13:53 | 22 | Lieutenant Poffenbarger, you may, if you wish, lower your |
| 10:13:57 | 23 | mask while testifying, if you so desire.  If not, I need you |
| 10:14:04 | 24 | to pull that microphone over to you.  I'm not sure exactly how |
| 10:14:08 | 25 | the acoustics are in here, but I need to hear and I'm sure |

| | | |
|---|---|---|
| 10:14:12 | 1 | counsel will need to hear everything you have to say, all |
| 10:14:14 | 2 | right? |
| 10:14:15 | 3 | THE WITNESS: I'm comfortable taking it off, Your |
| 10:14:17 | 4 | Honor, if everyone else in the room is. |
| 10:14:19 | 5 | THE COURT: I think so. You may. |
| 10:14:22 | 6 | Counsel, you may proceed. |
| 10:14:28 | 7 | MR. WIEST: One second, Your Honor. |
| 10:14:30 | 8 | **DIRECT EXAMINATION** |
| 10:14:31 | 9 | BY MR. WIEST: |
| 10:14:32 | 10 | **Q.** Sir, can you state your name for the record? |
| 10:14:33 | 11 | **A.** Michael Jerry Poffenbarger. |
| 10:14:35 | 12 | **Q.** And you are -- I'm going to talk about educational |
| 10:14:40 | 13 | history in a minute, but you are currently a reservist |
| 10:14:44 | 14 | stationed at Wright-Patterson Air Force Base? |
| 10:14:46 | 15 | **A.** That's correct, sir. |
| 10:14:47 | 16 | **Q.** Mike, where'd you go to high school? |
| 10:14:51 | 17 | **A.** I went to Anderson High School in Anderson, Indiana. |
| 10:14:53 | 18 | **Q.** What year did you graduate? |
| 10:14:54 | 19 | **A.** 1998. |
| 10:14:54 | 20 | **Q.** What did you do after that? |
| 10:14:56 | 21 | **A.** I went to Hanover College. |
| 10:14:57 | 22 | **Q.** And did you graduate? |
| 10:14:58 | 23 | **A.** Yes, sir. |
| 10:14:59 | 24 | **Q.** What year? |
| 10:14:59 | 25 | **A.** 2003. |

| | | |
|---|---|---|
| 10:15:00 | 1 | **Q.**   Did you eventually come to enlist in the United States |
| 10:15:06 | 2 | Air Force? |
| 10:15:07 | 3 | **A.**   Yes, sir.  After the events of September 11, 2001, |
| 10:15:11 | 4 | while I was in college, I decided I wanted to do something |
| 10:15:15 | 5 | to protect my nation; and over the years following |
| 10:15:19 | 6 | graduation from college, I determined that I should join the |
| 10:15:22 | 7 | military. |
| 10:15:23 | 8 | **Q.**   Okay.  And to do that you ended up enlisting in the Air |
| 10:15:26 | 9 | Force? |
| 10:15:26 | 10 | **A.**   Yes, sir. |
| 10:15:27 | 11 | **Q.**   What was your initial job in the Air Force? |
| 10:15:32 | 12 | **A.**   I was an airborne linguist. |
| 10:15:35 | 13 | **Q.**   And what year did you -- do you have the date you ended |
| 10:15:41 | 14 | up joining the Air Force? |
| 10:15:42 | 15 | **A.**   29th of November, 2005. |
| 10:15:45 | 16 | **Q.**   And that was active duty? |
| 10:15:46 | 17 | **A.**   Yes, sir. |
| 10:15:47 | 18 | **Q.**   And did you have any overseas deployments? |
| 10:15:54 | 19 | **A.**   I did, sir. |
| 10:15:54 | 20 | **Q.**   How many? |
| 10:15:56 | 21 | **A.**   I had two total. |
| 10:15:58 | 22 | **Q.**   If you could look at Exhibit 1 with me for a moment. |
| 10:16:06 | 23 |        THE COURT:  Counsel for the defendants, you have |
| 10:16:09 | 24 | seen these exhibits, correct? |
| 10:16:11 | 25 |        MS. YANG:  Yes, Your Honor, we have. |

| | | |
|---|---|---|
| 10:16:12 | 1 | THE COURT: Thank you. |
| 10:16:13 | 2 | BY MR. WIEST: |
| 10:16:13 | 3 | Q. Other than the redaction of part of your social security |
| 10:16:16 | 4 | number, this is a -- this is your career data brief for the |
| 10:16:21 | 5 | Air Force Reserve Officer CDV, correct? |
| 10:16:23 | 6 | A. That's correct, sir. |
| 10:16:24 | 7 | Q. This is an Air Force record? |
| 10:16:26 | 8 | A. Yes, sir. |
| 10:16:27 | 9 | Q. And this reflects much of your service? |
| 10:16:29 | 10 | A. It's fairly complete, sir. |
| 10:16:34 | 11 | Q. Okay. It includes, it looks like, 905.8 combat hours? |
| 10:16:43 | 12 | A. That's correct, sir. |
| 10:16:44 | 13 | Q. Various aircraft that you were involved in when you were |
| 10:16:48 | 14 | on active duty? |
| 10:16:49 | 15 | A. That's correct, sir. |
| 10:16:50 | 16 | Q. Okay. At some point did you get married? |
| 10:16:58 | 17 | A. Yes, sir. So my wife -- dated on and off while I was |
| 10:17:03 | 18 | enlisted and deployed, and after I returned from my second |
| 10:17:06 | 19 | deployment, I asked her to marry me, and we were married in |
| 10:17:12 | 20 | June of 2012. |
| 10:17:14 | 21 | Q. At some point you left active duty and joined the |
| 10:17:20 | 22 | Reserves. Do you remember when that was? |
| 10:17:22 | 23 | A. Yes, sir. I received orders in 2013 that my follow-on |
| 10:17:27 | 24 | for a third enlistment would be to Cannon Air Force Base on |
| 10:17:30 | 25 | the EC-130. I discussed it with my wife since she was now |

POFFENBARGER - DIRECT (WIEST)                                    8

10:17:34  1    part of my life, and we determined that it was the best

10:17:36  2    course for my family to transfer to the Reserves and leave

10:17:41  3    active duty.  And that was in 2014.

10:17:44  4    **Q.**   And what -- what were your job assignments?  And by the

10:17:56  5    way -- let me back up.  When you went to the Reserves, was

10:17:59  6    that at Wright-Patterson Air Force Base?

10:18:01  7    **A.**   Yes, sir, that's right.

10:18:03  8    **Q.**   Okay.  And that began in, I think you said, 2014?

10:18:06  9    **A.**   Yes, that's correct.

10:18:07  10   **Q.**   Okay.  And what kinds of things were you doing -- let me

10:18:12  11   back up.  Why did you want to transition to the Reserves?

10:18:15  12   **A.**   So I had two things in mind.  In leaving active duty I

10:18:21  13   did not have steady employment lined up when I moved back,

10:18:25  14   moving back home to Indiana, and I felt that it was

10:18:29  15   important that I had taken on responsibility of a family; at

10:18:36  16   that time I had a child and a wife, and they needed steady

10:18:38  17   income and they needed healthcare, needed taken care of.

10:18:42  18   And the Reserves was a way to take care of that.

10:18:44  19        I also felt that it was important to continue to serve

10:18:47  20   my country.  I had a lot of experience that I could give,

10:18:50  21   and I wanted to continue that.

10:18:51  22   **Q.**   And, currently, how many children do you have?

10:18:56  23   **A.**   I have four children, sir.

10:18:58  24   **Q.**   And what are their ages?

10:18:59  25   **A.**   Eight, five, two, and three months.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

POFFENBARGER - DIRECT (WIEST)                                    9

| | | |
|---|---|---|
| 10:19:04 | 1 | **Q.** When you left active duty, what -- what was your grade? |
| 10:19:09 | 2 | **A.** I was a staff sergeant, E-5. |
| 10:19:13 | 3 | **Q.** And at some point were you selected for officer training |
| 10:19:16 | 4 | school? |
| 10:19:17 | 5 | **A.** Yes, sir. |
| 10:19:18 | 6 | **Q.** And when was that? |
| 10:19:19 | 7 | **A.** In 2019, while I was at NCO Academy, I submitted |
| 10:19:24 | 8 | paperwork to the Wing for a deserving airman commissioning. |
| 10:19:30 | 9 | I was selected in -- I can't remember if it was the end of |
| 10:19:33 | 10 | 2019 or early 2020 I was selected to OTS. |
| 10:19:38 | 11 | **Q.** Okay. And so you attended OTS when? |
| 10:19:42 | 12 | **A.** In August and September of 2021. |
| 10:19:45 | 13 | **Q.** And then you commissioned after that? |
| 10:19:46 | 14 | **A.** I commissioned -- I think my commissioning date is the |
| 10:19:49 | 15 | 30th of September of 2021. |
| 10:19:53 | 16 | **Q.** Let's talk about your faith background just for a moment. |
| 10:19:57 | 17 | **A.** Yes, sir. |
| 10:19:57 | 18 | **Q.** What is your faith? |
| 10:20:00 | 19 | **A.** I'm a Christian, sir. |
| 10:20:02 | 20 | **Q.** And for how long have you been a Christian? |
| 10:20:06 | 21 | **A.** My entire life. |
| 10:20:06 | 22 | **Q.** Is there a flavor or denomination of Christianity that |
| 10:20:11 | 23 | you adhere to? |
| 10:20:12 | 24 | **A.** I was raised in a methodist church growing up. |
| 10:20:17 | 25 | **Q.** Did that affect in any way your decision to enlist? Was |

| | | |
|---|---|---|
| 10:20:20 | 1 | that a factor? |
| 10:20:22 | 2 | **A.**   Absolutely.  No question. |
| 10:20:23 | 3 | **Q.**   And why do you say that? |
| 10:20:25 | 4 | **A.**   Christians are called upon to protect the weak.  They |
| 10:20:30 | 5 | are called upon to serve those around us selflessly, to |
| 10:20:36 | 6 | leave everything if we must. |
| 10:20:38 | 7 | And after 2001, I knew that, as an adult man, I had the |
| 10:20:47 | 8 | capability to join the military, and I felt that I had a |
| 10:20:50 | 9 | responsibility to citizens in this country to do what I |
| 10:20:53 | 10 | could to protect my -- my nation and Constitution and |
| 10:21:00 | 11 | preserve everything I believe in. |
| 10:21:04 | 12 | **Q.**   That's a great point you just brought up.  When you |
| 10:21:07 | 13 | enlisted, did you take an oath? |
| 10:21:08 | 14 | **A.**   Yes, sir, of course. |
| 10:21:09 | 15 | **Q.**   And what was that oath to? |
| 10:21:11 | 16 | **A.**   Protect and defend the Constitution of the United |
| 10:21:14 | 17 | States of America. |
| 10:21:14 | 18 | **Q.**   All the Constitution? |
| 10:21:15 | 19 | **A.**   The entire Constitution, sir. |
| 10:21:17 | 20 | **Q.**   Did they except out the First Amendment? |
| 10:21:19 | 21 | **A.**   No, sir. |
| 10:21:19 | 22 | **Q.**   Okay. |
| 10:21:21 | 23 | **A.**   I wouldn't have taken the oath if they had. |
| 10:21:23 | 24 | **Q.**   Okay.  Did you take a similar oath when you commissioned? |
| 10:21:27 | 25 | **A.**   Of course. |

| | | |
|---|---|---|
| 10:21:28 | 1 | **Q.**    Let's look at Exhibit 2. |
| 10:21:41 | 2 |        Is this a copy of a memorandum for all Department of Air |
| 10:21:46 | 3 | Force commanders that was issued by Secretary Kendall? |
| 10:21:49 | 4 | **A.**    I have seen it.  Yes, sir, it is. |
| 10:21:52 | 5 | **Q.**    And this is a vaccine mandate, for lack of a better term, |
| 10:21:53 | 6 | in terms of a directive to enforce to obtain and receive the |
| 10:21:57 | 7 | COVID vaccine? |
| 10:21:57 | 8 | **A.**    That is what it says, sir. |
| 10:21:59 | 9 | **Q.**    And you received this, I'm guessing, shortly after |
| 10:22:04 | 10 | September 2001?  September 3rd? |
| 10:22:07 | 11 | **A.**    2021, sir? |
| 10:22:08 | 12 | **Q.**    Yes, sir, 2021. |
| 10:22:09 | 13 | **A.**    While I was OTS, I received this, sir. |
| 10:22:12 | 14 | **Q.**    Did you begin the religious accommodation process while |
| 10:22:16 | 15 | you were still at OTS? |
| 10:22:17 | 16 | **A.**    About five minutes after we received this letter, sir, |
| 10:22:20 | 17 | I headed directly to the chaplain at OTS. |
| 10:22:26 | 18 | **Q.**    Okay.  And did the chaplain tell you what you needed to |
| 10:22:29 | 19 | do to submit an accommodation? |
| 10:22:30 | 20 | **A.**    Yes.  He said that the Air Force has religious |
| 10:22:34 | 21 | accommodation for vaccines, and that I should begin the |
| 10:22:36 | 22 | process by notifying the command there and the command at my |
| 10:22:40 | 23 | home station. |
| 10:22:40 | 24 | **Q.**    And you did that? |
| 10:22:41 | 25 | **A.**    I did that immediately, sir. |

| | | |
|---|---|---|
| 10:22:42 | 1 | **Q.**   Look at Exhibit 3 with me just for a minute. |
| 10:22:50 | 2 | This is a -- is this a copy of an order you received from |
| 10:22:56 | 3 | Lieutenant Colonel Sopko on or about October 22, 2021, to |
| 10:23:01 | 4 | receive the vaccine? |
| 10:23:02 | 5 | **A.**   It is, sir. |
| 10:23:03 | 6 | **Q.**   And he directed that you obtain the vaccine by 3 October, |
| 10:23:07 | 7 | although I do see that you could submit for an exemption was |
| 10:23:11 | 8 | an option as well? |
| 10:23:13 | 9 | **A.**   That's correct, sir.  And he was aware that I had |
| 10:23:15 | 10 | submitted a religious accommodation. |
| 10:23:17 | 11 | **Q.**   And that was pending at that point in time? |
| 10:23:20 | 12 | **A.**   Yes, sir. |
| 10:23:20 | 13 | **Q.**   Were you interviewed by chaplains at OTS? |
| 10:23:23 | 14 | **A.**   Yes. |
| 10:23:23 | 15 | **Q.**   And how many chaplains interviewed you there? |
| 10:23:25 | 16 | **A.**   I spoke with one over the phone and one in person |
| 10:23:30 | 17 | pertaining to the religious accommodation specifically. |
| 10:23:33 | 18 | **Q.**   Did they confirm the sincerity of your beliefs? |
| 10:23:36 | 19 | **A.**   To the best of my knowledge they did.  They told me to |
| 10:23:40 | 20 | my face that they did. |
| 10:23:41 | 21 | **Q.**   Look at Exhibit 4 for me real quick. |
| 10:23:46 | 22 | Your religious accommodation request went up, because you |
| 10:23:50 | 23 | were a reservist, to Lieutenant General Scobee, correct? |
| 10:23:54 | 24 | **A.**   That's correct, sir. |
| 10:23:55 | 25 | **Q.**   And is Exhibit 4 the denial of that accommodation request |

POFFENBARGER - DIRECT (WIEST)                    13

| | | |
|---|---|---|
| 10:23:58 | 1 | that he issued on October 22, 2021? |
| 10:24:00 | 2 | **A.**   It is, sir. |
| 10:24:01 | 3 | **Q.**   I want to read a couple things in there with you and to |
| 10:24:04 | 4 | you.  He says, "I do not doubt the sincerity of your beliefs," |
| 10:24:08 | 5 | correct? |
| 10:24:09 | 6 | **A.**   That's what it says, sir. |
| 10:24:10 | 7 | **Q.**   He says, "All immunizations, including those listed |
| 10:24:16 | 8 | above, are an important element of mission accomplishment, as |
| 10:24:23 | 9 | they contribute to the health, safety, and readiness of the |
| 10:24:23 | 10 | force," correct? |
| 10:24:23 | 11 | **A.**   Yes. |
| 10:24:23 | 12 | **Q.**   And if we go down a little bit further, he says, |
| 10:24:26 | 13 | "Specifically regarding the COVID-19 vaccination, since less |
| 10:24:28 | 14 | restrictive means of protecting our force from COVID-19 are |
| 10:24:31 | 15 | unavailable, all uniformed Airmen must be fully vaccinated |
| 10:24:34 | 16 | against COVID-19 and other infections diseases."  That's what |
| 10:24:40 | 17 | he told you? |
| 10:24:40 | 18 | **A.**   Yes, sir. |
| 10:24:40 | 19 | **Q.**   But we know that, in fact, the Air Force has granted |
| 10:24:41 | 20 | thousands of medical and administrative exemptions? |
| 10:24:45 | 21 | **A.**   Yes, I know that, sir. |
| 10:24:48 | 22 | **Q.**   Okay.  You took an appeal of General Scobee's denial, |
| 10:24:51 | 23 | correct?  On October 30, 2021.  And that's at Exhibit 5? |
| 10:24:55 | 24 | **A.**   Yes, sir, I submitted that. |
| 10:24:56 | 25 | **Q.**   Okay.  You comment -- by the way, are the statements that |

| | | |
|---|---|---|
| 10:25:03 | 1 | you made in this exemption request true?  Do they reflect your |
| 10:25:06 | 2 | beliefs? |
| 10:25:06 | 3 | **A.**   Yes, sir.  Of course.  I wrote them. |
| 10:25:09 | 4 | **Q.**   Okay.  And I just want to reflect what you are telling -- |
| 10:25:13 | 5 | in this case, this was a memo that was submitted to Lieutenant |
| 10:25:17 | 6 | General Miller, the Sergeant General of the Air Force, |
| 10:25:19 | 7 | correct? |
| 10:25:19 | 8 | **A.**   Yes, sir. |
| 10:25:22 | 9 | **Q.**   He's the appeal authority? |
| 10:25:22 | 10 | **A.**   I believe so.  That's what my understanding is, sir, |
| 10:25:24 | 11 | yes. |
| 10:25:24 | 12 | **Q.**   I don't think the government's disputing that he is the |
| 10:25:28 | 13 | appeal authority, so we are good on that. |
| 10:25:30 | 14 | You say, "Murder is a sin as is participation in that |
| 10:25:33 | 15 | murder"? |
| 10:25:34 | 16 | **A.**   It is. |
| 10:25:34 | 17 | **Q.**   "All COVID-19 vaccines are associated with abortion"? |
| 10:25:39 | 18 | **A.**   To my knowledge. |
| 10:25:39 | 19 | **Q.**   At least all the current ones on the market. |
| 10:25:42 | 20 | **A.**   To the best of my knowledge. |
| 10:25:42 | 21 | **Q.**   "The J & J used abortion cell lines in the design, |
| 10:25:45 | 22 | production, and testing phases.  The Pfizer and Moderna both |
| 10:25:49 | 23 | used these cell lines in the testing phase."  And you cite the |
| 10:25:52 | 24 | articles that demonstrate that? |
| 10:25:53 | 25 | **A.**   As I said, sir, to the best of my knowledge. |

POFFENBARGER - DIRECT (WIEST)                                    15

10:25:56  1  **Q.**   Okay.  And I realize you are not an expert, but you did

10:25:58  2  some research on this, and it violated your faith and your

10:26:01  3  conscience?

10:26:01  4  **A.**   Yes, sir.

10:26:02  5  **Q.**   Have you ever received vaccines in the past?

10:26:10  6  **A.**   Yes, sir, of course.

10:26:12  7  **Q.**   At the time that you did -- let me back up.  Have you

10:26:18  8  always held these beliefs regarding the aborted fetal cell

10:26:23  9  issue?

10:26:23  10  **A.**   Well, I have always held that abortion is an evil --

10:26:23  11  **Q.**   Okay.

10:26:26  12  **A.**   -- and a sin to partake in, to be a part of.

10:26:32  13  **Q.**   And would it be fair to say that if you've received

10:26:36  14  vaccines in the past, it would be because you didn't have

10:26:41  15  knowledge that they contained these illicit cell lines?

10:26:45  16  **A.**   That's correct, sir.  I had absolutely no idea that a

10:26:46  17  medical establishment in this country would use aborted

10:26:48  18  fetuses in any way, shape, or form in medicine.

10:26:51  19  **Q.**   If a vaccine were to come out on the market that did not

10:27:00  20  contain or was not tested with and was not derived from

10:27:04  21  aborted fetal tissue related to COVID-19, would you receive

10:27:08  22  that vaccine?

10:27:09  23  **A.**   Sir, a vaccine that has good safety data and has been

10:27:14  24  endorsed by the government and does not contain aborted

10:27:17  25  fetal cells or does not use them, of course I would take

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

POFFENBARGER - DIRECT (WIEST)                                    16

| | | |
|---|---|---|
| 10:27:21 | 1 | that, sir. |
| 10:27:22 | 2 | **Q.** All right. General Miller -- look at Exhibit 6 with |
| 10:27:27 | 3 | me -- denied your appeal on December 8, 2021. Yes? |
| 10:27:35 | 4 | **A.** Yes, he did. |
| 10:27:36 | 5 | **Q.** And this is the copy of that? |
| 10:27:39 | 6 | **A.** Yes, it is. |
| 10:27:39 | 7 | **Q.** Does he address at all in here why they've granted |
| 10:27:50 | 8 | thousands of medical and administrative exemptions but he is |
| 10:27:54 | 9 | denying your religious exemption? |
| 10:27:56 | 10 | **A.** I didn't see anything in here that explained why. |
| 10:27:58 | 11 | **Q.** All right. As a result of that, you were called to |
| 10:28:03 | 12 | active duty for the purposes of receiving discipline, correct? |
| 10:28:07 | 13 | **A.** Yes, sir, that's correct. |
| 10:28:08 | 14 | **Q.** And that was done on your -- you were to report to active |
| 10:28:14 | 15 | duty on January 3, 2022? |
| 10:28:20 | 16 | **A.** My commander, Lieutenant Colonel Kojack, called me on |
| 10:28:23 | 17 | the phone and notified me of that fact immediately after I |
| 10:28:26 | 18 | received the letter from Lieutenant General Miller, that |
| 10:28:29 | 19 | they would be calling me in in order to discipline me, and |
| 10:28:33 | 20 | that that would be the first week of January of this year. |
| 10:28:36 | 21 | **Q.** And rather than allow you the normal 45-day response |
| 10:28:40 | 22 | time, they took the extra step of putting you on active duty |
| 10:28:42 | 23 | to cut that response time to three days? |
| 10:28:44 | 24 | **A.** That's correct, sir. |
| 10:28:45 | 25 | **Q.** Okay. And, in fact, that's what they did, and there is a |

POFFENBARGER - DIRECT (WIEST)                                    17

| | | |
|---|---|---|
| 10:28:51 | 1 | record of that at Exhibit 7.  Yes? |
| 10:28:54 | 2 | **A.**   That's exactly what they did, sir. |
| 10:28:58 | 3 | **Q.**   Exhibit 7 also, if you go a couple pages back after the |
| 10:29:01 | 4 | letter of reprimand, indicates that you're being denied |
| 10:29:04 | 5 | participation for points in pay? |
| 10:29:05 | 6 | **A.**   Yes, sir. |
| 10:29:06 | 7 | **Q.**   Right?  You responded to that on 6 January, in part |
| 10:29:10 | 8 | asking them just to stay their hand pending this litigation. |
| 10:29:13 | 9 | And what ended up happening -- and we see that on -- towards |
| 10:29:17 | 10 | the second to last page of this exhibit -- Colonel Smith said, |
| 10:29:20 | 11 | "Nope.  I'm going to go ahead and I am confirming this letter |
| 10:29:23 | 12 | of reprimand," right? |
| 10:29:25 | 13 | **A.**   That's correct, sir, yes. |
| 10:29:26 | 14 | **Q.**   And then you asked -- because your family needs their |
| 10:29:30 | 15 | health insurance, you went and asked Senior Airman Mather to |
| 10:29:34 | 16 | confirm when your health insurance was going to be terminated, |
| 10:29:37 | 17 | and that memo is reflected on the 7 January memo at the end of |
| 10:29:44 | 18 | Exhibit 7? |
| 10:29:45 | 19 | **A.**   Yes, sir.  I have a young baby, and he needs to see the |
| 10:29:49 | 20 | doctor quite regularly, and I was afraid that we would be |
| 10:29:52 | 21 | liable for a lot of medical bills if I didn't know exactly |
| 10:29:55 | 22 | when my health insurance would be cut off from this action. |
| 10:29:59 | 23 | **Q.**   I want to look at Exhibit 8 with you. |
| 10:30:03 | 24 | **A.**   Okay. |
| 10:30:05 | 25 | **Q.**   Because a couple days later, following a status call with |

10:30:10  1    this Court, they rescinded the letter of reprimand, reissued

10:30:19  2    it, and put you on a 45-day clock to respond?

10:30:23  3    **A.**   Yes, sir, that's correct.

10:30:24  4    **Q.**   Okay.

10:30:25  5    **A.**   I was very surprised at that.

10:30:28  6    **Q.**   And as I understand it, that response is -- because you

10:30:31  7    signed for it on January 14th?

10:30:33  8    **A.**   Yes, sir.

10:30:33  9    **Q.**   Of 2022, right?

10:30:35  10   **A.**   My mother-in-law signed for it, sir.

10:30:37  11   **Q.**   She was your agent?

10:30:38  12   **A.**   Yes, sir.

10:30:39  13   **Q.**   She signed for it.  That response is due on February 28,

10:30:42  14   2022, and we have no reason to believe Colonel Smith won't

10:30:46  15   confirm the letter of reprimand again on that date?

10:30:49  16   **A.**   I'm assuming that he was so quick to do the same

10:30:53  17   before, that he will do the same again.

10:30:54  18   **Q.**   And so your family stands to lose the TriCare insurance

10:30:58  19   on March 1, 2022?

10:30:59  20   **A.**   We are trying to make contingency plans for that

10:31:03  21   happening, sir, yes.

10:31:05  22   **Q.**   Okay.  You joined the Reserves in part for retirement;

10:31:12  23   yes?

10:31:12  24   **A.**   Yes, sir.

10:31:13  25   **Q.**   You served -- let me go back and look at this -- 2005 to

POFFENBARGER - DIRECT (WIEST)                                    19

10:31:23  1   2012, seven years of active duty?

10:31:26  2   A.   2014, sir.

10:31:27  3   Q.   2014?

10:31:28  4   A.   I believe I have nine or --

10:31:30  5   Q.   Nine years?

10:31:31  6   A.   In the neighborhood of nine years.

10:31:32  7   Q.   Nine years of active duty, and then as a reservist you

10:31:36  8   accrue pay and points that ultimately allow you to obtain a

10:31:40  9   military retirement when you turn, is it, age 60 or 65?

10:31:42 10   A.   So I will be eligible for retirement after I have 20

10:31:45 11   good years, which will be coming up here in a couple years,

10:31:49 12   but you don't receive full retirement benefits until you

10:31:50 13   reach age 60 minus the number of times you have been

10:31:54 14   deployed.  There is a calculus involved that I am not really

10:31:57 15   qualified to discuss.  It's complicated.

10:31:59 16   Q.   You are not 100 percent sure how it works?

10:32:01 17   A.   I just know that it's somewhere around age 60 that you

10:32:05 18   start receiving retirement pay.

10:32:07 19   Q.   And obviously no points/no pay means no retirement,

10:32:09 20   right?

10:32:09 21   A.   Correct, sir.

10:32:10 22   Q.   Because you are not getting good years, correct?

10:32:12 23   A.   I am not getting good years, and I haven't reached 20

10:32:15 24   good years of service yet, sir.

10:32:17 25   Q.   Do you know that begs the question, I mean, you've had

POFFENBARGER - DIRECT (WIEST)                    20

10:32:22  1   all this time in the Air Force, all this time serving your

10:32:24  2   country.  Why not just go and get the vaccine?  Wouldn't it be

10:32:28  3   easier?

10:32:29  4   **A.**   Just because it's easy doesn't mean it's right.

10:32:37  5   **Q.**   You understand that if they wanted to escalate this as a

10:32:40  6   reservist, you know, they could put you in prison.  Would that

10:32:43  7   be enough to get you to -- to obtain this vaccine?

10:32:46  8   **A.**   No, sir.  Although I do not wish to go to prison -- I

10:32:52  9   have a family to take care of -- it is my duty to uphold my

10:33:01  10  faith under peril of life or death.

10:33:06  11              MR. WIEST:  I have no further questions.

10:33:08  12              THE COURT:  All right.

10:33:10  13              MR. WIEST:  One second, Your Honor.

10:33:12  14       (Pause.)

10:33:25  15  BY MR. WIEST:

10:33:25  16  **Q.**   Just one final question.  You said you joined the

10:33:27  17  military to help protect the weak?

10:33:28  18  **A.**   Yes, sir.

10:33:29  19  **Q.**   Is there anyone that is more weak than the unborn?

10:33:32  20  **A.**   Not to my knowledge, sir.

10:33:35  21  **Q.**   Thank you.

10:33:34  22              MR. WIEST:  Your Honor, I have nothing further.

10:33:40  23              THE COURT:  So, Mr. Poffenbarger?

10:33:44  24              THE WITNESS:  Yes, Your Honor.

10:33:45  25              THE COURT:  Just to clarify what you have said,

| | | |
|---|---|---|
| 10:33:47 | 1 | basically what you're saying is, is that you have received a |
| 10:33:50 | 2 | number of vaccines in the past, whether or not you did not |
| 10:33:56 | 3 | realize or know whether or not those vaccines entailed the |
| 10:33:59 | 4 | same type of makeup that this vaccine does, and so therefore |
| 10:34:03 | 5 | you went ahead and got those vaccines, correct? |
| 10:34:07 | 6 | THE WITNESS:  Yes, Your Honor. |
| 10:34:07 | 7 | THE COURT:  All right.  And so are you saying that |
| 10:34:10 | 8 | if another vaccine with regard to COVID-19 were developed, not |
| 10:34:19 | 9 | utilizing those substances to which you have shared with the |
| 10:34:24 | 10 | record you object to, that you would not hesitate to get that? |
| 10:34:27 | 11 | THE WITNESS:  No hesitation, Your Honor. |
| 10:34:29 | 12 | THE COURT:  Thank you. |
| 10:34:29 | 13 | You may inquire. |
| 10:34:39 | 14 | MS. YANG:  Thank you, Your Honor. |
| 10:34:32 | 15 | **CROSS-EXAMINATION** |
| 10:34:35 | 16 | BY MS. YANG: |
| 10:34:41 | 17 | **Q.** Good morning, sir. |
| 10:34:41 | 18 | **A.** Good morning, ma'am. |
| 10:34:42 | 19 | **Q.** My name is Catherine Yang.  I am with the Department of |
| 10:34:42 | 20 | Justice. |
| 10:34:45 | 21 | Sir, as a reservist, you also have civilian employment; |
| 10:34:48 | 22 | is that right? |
| 10:34:48 | 23 | **A.** Yes, ma'am, that's correct. |
| 10:34:48 | 24 | **Q.** Is that full-time or part-time? |
| 10:34:50 | 25 | **A.** That's a full-time job, ma'am. |

| | | |
|---|---|---|
| 10:34:51 | 1 | **Q.**   And what is that job? |
| 10:34:52 | 2 | **A.**   I'm a field surveyor, ma'am. |
| 10:34:55 | 3 | **Q.**   Is that indoor work, outdoor work, or -- |
| 10:34:58 | 4 | **A.**   Outdoor work, ma'am. |
| 10:34:59 | 5 | **Q.**   Outdoor work entirely? |
| 10:35:01 | 6 | **A.**   Yes, ma'am. |
| 10:35:02 | 7 | **Q.**   Do you have to physically interact with other people in |
| 10:35:04 | 8 | that job? |
| 10:35:04 | 9 | **A.**   From time to time, yes, ma'am. |
| 10:35:06 | 10 | **Q.**   Approximately how much of your week is spent interacting |
| 10:35:09 | 11 | physically with other people in that job? |
| 10:35:11 | 12 | **A.**   Well, I'm alone most of the day.  I have one other |
| 10:35:17 | 13 | coworker, but we rarely spend time together because it's -- |
| 10:35:22 | 14 | most of the stuff is automated now.  So setting up an |
| 10:35:25 | 15 | instrument and working on a handheld computer, I don't |
| 10:35:28 | 16 | really need to be around anybody. |
| 10:35:30 | 17 |      I couldn't really give you numbers like percentagewise, |
| 10:35:33 | 18 | but maybe a couple hours in the morning and then a couple |
| 10:35:36 | 19 | hours in the afternoon when we're packing things up. |
| 10:35:41 | 20 | **Q.**   Thank you.  And approximately how many people do you |
| 10:35:43 | 21 | physically interact with in a regular week in this job? |
| 10:35:46 | 22 | **A.**   A regular week, just one. |
| 10:35:47 | 23 | **Q.**   Do you attend church services on a regular basis? |
| 10:35:50 | 24 | **A.**   Yes, ma'am. |
| 10:35:50 | 25 | **Q.**   How often? |

POFFENBARGER - CROSS (YANG)                          23

10:35:51   1   **A.**   It depends.  Usually once or twice a week.

10:35:55   2   **Q.**   Are those held indoors or outdoors?

10:35:57   3   **A.**   Both sometimes.

10:35:58   4   **Q.**   Is there a -- is there a common practice of -- would you

10:36:02   5   say that the proportion of services that are held indoors is

10:36:07   6   greater than the services that are held outdoors, or are they

10:36:11   7   pretty equal?

10:36:11   8   **A.**   Yes, ma'am.  I live in Indiana.  It's cold in the

10:36:14   9   wintertime, so --

10:36:15   10   **Q.**   I understand.  What is the size of your congregation?

10:36:18   11   **A.**   Oh, maybe -- maybe, in total, 100.  I couldn't say for

10:36:23   12   sure.

10:36:23   13   **Q.**   Would you say that the services are pretty well attended?

10:36:25   14   **A.**   Sometimes.  Like most churches in America, the vast

10:36:29   15   majority of them are older.  So I'd say maybe 50 percent of

10:36:35   16   the congregation is regular.

10:36:38   17   **Q.**   Do you -- do you go out to eat at restaurants?

10:36:41   18   **A.**   Sometimes.

10:36:43   19   **Q.**   Approximately how often would you say you go out to eat

10:36:46   20   at restaurants?

10:36:47   21   **A.**   Once a month maybe, we get a date night.

10:36:52   22   **Q.**   When you have your date nights, do you dine in or do you

10:36:57   23   take out?

10:36:57   24   **A.**   Both, but usually we take out.

10:37:00   25   **Q.**   How many times in the last few months have you dined in

10:37:03  1   at a restaurant?

10:37:04  2   **A.**   Well, I did last night.  But maybe three times, maybe

10:37:12  3   twice.

10:37:14  4   **Q.**   As a reservist, you have been assigned to the

10:37:17  5   intelligence office; is that correct?

10:37:19  6   **A.**   Yes, ma'am.

10:37:19  7   **Q.**   And before you can perform your duties as an intelligence

10:37:23  8   officer, you are required to attend and complete intelligence

10:37:27  9   officer training; is that correct?

10:37:28  10  **A.**   Yes, ma'am, that's correct.

10:37:28  11  **Q.**   And that's different from the officer training school

10:37:30  12  that you completed last fall?

10:37:33  13  **A.**   Yes, ma'am.

10:37:33  14  **Q.**   You haven't yet attended or completed that intelligence

10:37:36  15  officer training, have you?

10:37:37  16  **A.**   No, ma'am, not yet.

10:37:38  17  **Q.**   Are you aware that the average class size for the

10:37:42  18  intelligence officer training is 15 people?

10:37:45  19  **A.**   I wasn't aware of that, but it doesn't surprise me.

10:37:48  20  **Q.**   Are you aware that the training lasts for approximately

10:37:51  21  five months?

10:37:51  22  **A.**   I've heard six months, but that's good news if it's

10:37:55  23  only five.

10:37:55  24  **Q.**   And that's five days a week, about eight hours a day for

10:37:58  25  that period of time?

10:37:59  1    **A.**    I think so.  There's usually study halls and stuff

10:38:02  2    afterwards.  I was a good fellow before with my previous

10:38:06  3    jobs, and the days were usually quite long.

10:38:08  4    **Q.**    Are you aware that the training for intelligence officer

10:38:11  5    training, that's held in a secured facility?

10:38:14  6    **A.**    I believe most of it is, yes, ma'am.

10:38:18  7    **Q.**    And as a result of the secure facility, it means that

10:38:21  8    there are no windows or doors or outside ventilation that can

10:38:25  9    occur.  Are you aware of that?

10:38:26  10   **A.**    Yes, ma'am.

10:38:27  11   **Q.**    Are you aware that about 87 percent of the training

10:38:30  12   material is classified and can only be accessed through the

10:38:33  13   secure facility?

10:38:33  14   **A.**    I'm surprised it's only that percentage.

10:38:37  15   **Q.**    You would expect it to be higher?

10:38:39  16   **A.**    I would expect it to be higher, yes, ma'am.

10:38:40  17   **Q.**    And are you aware that you would have to share work

10:38:43  18   stations with others in the training?

10:38:43  19   **A.**    That's not a surprise, ma'am.

10:38:45  20   **Q.**    In addition to that training, you are also required to

10:38:49  21   attend unit training assemblies, or UTAs.  Are you familiar

10:38:54  22   with that?

10:38:54  23   **A.**    Yes, ma'am.  Usually not concurrent with that training.

10:38:57  24   It's usually before and after the training period.

10:38:58  25   **Q.**    Understood.  And the UTAs are a designated weekend each

10:39:01  1    month when reservists like yourself would go in to perform

10:39:06  2    their duties; is that right?

10:39:06  3    A.    Yes, ma'am.

10:39:06  4    Q.    And there are designated weekends for the entire unit; is

10:39:11  5    that right?

10:39:11  6    A.    So Wright-Patterson Air Force Base usually has a

10:39:15  7    schedule that's split, even before the reaction to COVID and

10:39:20  8    the things that have been in place since then, where there

10:39:23  9    is what they call a scarlet weekend and a gray weekend.  I

10:39:28  10   don't know that it's split 50/50, but that's usually what

10:39:31  11   they do is they bring in approximately half the reservists

10:39:33  12   for one weekend, half the reservists for the other.  I don't

10:39:37  13   know specifically why, but I assume that it has to do with

10:39:39  14   the number of facilities on base for that number of people.

10:39:41  15   Q.    Understood.  But the unit is -- comes in for their UTA

10:39:46  16   weekend on a designated schedule.  Is that fair to say?

10:39:49  17   A.    Yes, ma'am.

10:39:52  18   Q.    And that work would also occur in a secure facility,

10:39:54  19   right?

10:39:54  20   A.    Some of it, yes, ma'am.

10:39:56  21   Q.    Would you be able to say what proportion occurs in a

10:40:01  22   secure facility and what doesn't?

10:40:02  23   A.    Well, I am not fully qualified yet, ma'am, but I would

10:40:05  24   say, my guess just from what I've seen, is probably 50/50.

10:40:11  25   Q.    And your work as an intelligence officer would require

10:40:17   1   the use of classified materials and systems; is that right?

10:40:20   2   A.   Yes, ma'am.

10:40:20   3   Q.   And those are the types of materials and systems that

10:40:23   4   would have to be in a secure facility in order to access; is

10:40:26   5   that right?

10:40:26   6   A.   From what I am aware, yes, ma'am.

10:40:28   7   Q.   Are you aware of secure materials and systems that you

10:40:32   8   can access not from a secured facility?

10:40:33   9   A.   Well, going to and from aircraft and things like that,

10:40:37   10  ma'am, sometimes -- again, I'm not fully qualified.  So my

10:40:42   11  understanding is sometimes classified materials have to be

10:40:44   12  taken between areas.  But I may be wrong in that.

10:40:48   13  Q.   And are you -- are you familiar with the term "the

10:40:55   14  vault" --

10:40:56   15  A.   Yes, ma'am.

10:40:56   16  Q.   -- at Wright-Patterson, and that refers to the secure

10:41:01   17  facility that you are working in?

10:41:02   18  A.   Yes, ma'am.  I believe that's a classified secret

10:41:04   19  facility maybe, and that's within the 445th OSS building.

10:41:09   20  Q.   Right.  To the best of your knowledge, information --

10:41:12   21  classified information can't be taken out of the vault, can

10:41:16   22  it?

10:41:16   23  A.   As I said, ma'am, I have not fully trained on that yet,

10:41:23   24  so I wouldn't speak to it, but I assume that classified

10:41:26   25  material is not coming and going all day long, if that's

10:41:28  1    what you are asking.

10:41:29  2    **Q.**   And your work there in the vault would also require

10:41:32  3    interaction with other people too, right?

10:41:35  4    **A.**   There is a small group that work in the vault all day.

10:41:38  5    **Q.**   Sure.  Exchanging information, you know, classified

10:41:41  6    information as an -- as to be intelligence officers would

10:41:45  7    require some amount of collaboration between individuals,

10:41:49  8    correct?

10:41:49  9    **A.**   Yes.

10:41:50  10   **Q.**   You -- I believe you explained earlier that you

10:41:52  11   commissioned as an officer in September of last year; is that

10:41:55  12   right?

10:41:55  13   **A.**   Yes, ma'am, that's correct.

10:41:56  14   **Q.**   And since then, have you attended just one UTA weekend?

10:42:00  15   **A.**   I think that's correct, ma'am.  I had to come in

10:42:14  16   several times between my commissioning date and the weekend

10:42:23  17   in January.  I know that one of those was a UTA weekend.  I

10:42:26  18   can't remember if the other ones were they just brought me

10:42:29  19   in on orders to take care of paperwork or how they were

10:42:34  20   classified.  I'm not sure.

10:42:34  21   **Q.**   Okay.  How many people were there with you in the vault

10:42:36  22   during your UTA weekend?

10:42:38  23   **A.**   I did not take a head count, ma'am, but my guess would

10:42:46  24   be six or eight others, ma'am.

10:42:47  25   **Q.**   Do you know whether that was a low, normal, high

| 10:42:50 | 1 | participation UTA weekend? |
|---|---|---|

10:42:50  1  participation UTA weekend?

10:42:54  2  **A.**   As you said, I haven't been there very often.  So I

10:42:57  3  don't have enough experience to say if that's low or high.

10:43:00  4  I have no idea.

10:43:00  5  **Q.**   Sure.  Are you aware that there can be up to 21 people

10:43:04  6  participating during any given UTA weekend?

10:43:07  7  **A.**   I don't know, ma'am, but that doesn't surprise me.

10:43:10  8  **Q.**   Do you have any reason to disagree that that would be the

10:43:12  9  case?

10:43:13  10  **A.**   No, ma'am.  I'll stipulate to that.

10:43:15  11  **Q.**   When you went in for the UTA weekend, you were working in

10:43:20  12  the common area; is that right?  At the vault?

10:43:22  13  **A.**   Yes, ma'am.

10:43:22  14  **Q.**   And there are about six desks in that area?

10:43:25  15  **A.**   That's about right, yes, ma'am.

10:43:26  16  **Q.**   To the best of your memory.

10:43:29  17       And to the best of your memory, were there floor-to-

10:43:33  18  ceiling walls separating those desks?

10:43:34  19  **A.**   So the desks are maybe about as big as this area right

10:43:37  20  here (indicating), maybe a little bit wider, and the walls

10:43:40  21  going up may five feet.  Not all the way to the ceiling but

10:43:45  22  you have to peer over them.  They're not low like these

10:43:48  23  walls are here.

10:43:48  24  **Q.**   Sure.  But it's not enclosed spaces?

10:43:51  25  **A.**   They are not enclosed offices, no, ma'am.

10:43:53  1    **Q.**   And are you aware that -- or, rather, you -- I believe

10:43:58  2    you have submitted a declaration in this case where you have

10:44:01  3    described some offices, you know, off behind that common area

10:44:05  4    that you work in.  Do you remember that?

10:44:06  5    **A.**   Yes.  So it's kind of an open room, maybe about as big

10:44:09  6    as this is, and then like if this were that area, like there

10:44:13  7    would be offices on that wall and then maybe two bigger

10:44:17  8    rooms in this wall behind me.  Something like that.

10:44:18  9    **Q.**   Are you aware that those offices are reserved for senior

10:44:22  10   officers and leadership?

10:44:23  11   **A.**   The ones on that side are.  These back here

10:44:26  12   (indicating) are like conference room area and offices.

10:44:28  13   **Q.**   Do you have any reason to dispute that the offices are

10:44:30  14   reserved for the senior officers and leadership?

10:44:33  15   **A.**   No dispute, ma'am.

10:44:35  16   **Q.**   You are still currently getting your reduced rate health

10:44:44  17   insurance benefits as of right now, correct?

10:44:47  18   **A.**   Right now -- I have been charged for this month, yes,

10:44:50  19   ma'am.

10:44:50  20   **Q.**   And you haven't been discharged from the service?

10:44:52  21   **A.**   So as that paper stated, they have rescinded all of

10:44:57  22   that.  So I don't -- it's up in the air.  But as of this

10:45:02  23   date, I believe I'm on a no-pay/no-point status.

10:45:06  24   **Q.**   Are you familiar that discharge within the military has a

10:45:10  25   very specific meaning?

POFFENBARGER - CROSS (YANG)                                        31

10:45:11   1    A.    Yes, ma'am.

10:45:11   2    Q.    And have you been discharged --

10:45:12   3    A.    No, ma'am.

10:45:12   4    Q.    -- from the service?

10:45:15   5          To the best of your knowledge, are there any discharge

10:45:15   6    proceedings that have been initiated?

10:45:17   7    A.    So they have been initiated -- from my understanding of

10:45:24   8    how it all was going to work, they were initiated and then

10:45:28   9    they were rescinded the week after -- what was that

10:45:33   10   letter -- the 10th of January.

10:45:34   11   Q.    So there are no -- no further discharge proceedings that

10:45:38   12   have been initiated as of this date?

10:45:40   13   A.    No, ma'am.

10:45:40   14   Q.    And you have been told that if you don't get vaccinated

10:45:45   15   you are going to be reassigned to the Individual Ready

10:45:50   16   Reserve; is that right?

10:45:50   17   A.    Pending discharge, yes, ma'am.

10:45:52   18   Q.    You've been instructed that you --

10:45:55   19   A.    That's what I have been --

10:45:56   20   Q.    -- the end of your IRR?

10:45:58   21   A.    Yes, ma'am, I have been told that they are putting me

10:46:02   22   on IRR until they can discharge me.

10:46:04   23   Q.    Who told you that?

10:46:05   24   A.    Lieutenant Colonel Kojack and the -- all the people

10:46:13   25   that were in the line when we went through our IRR

POFFENBARGER - CROSS (YANG)                    32

```
10:46:18   1   processing line, they said that you are going to sign this
10:46:20   2   paperwork, and this will begin a proceedings to put you on
10:46:25   3   IRR.  And then after IRR, then you'll be discharged from the
10:46:27   4   service.
10:46:27   5   Q.   And IRR remains part of the military; is that right?
10:46:32   6   A.   So, yes, it's a part of the military that has no
10:46:37   7   benefits, and you don't get health insurance, and you get no
10:46:39   8   points, and it doesn't count towards retirement to my
10:46:44   9   understanding.  Again, I'm not a personnelist.  But, yes, I
10:46:51  10   guess you are classified within the scope of military.
10:46:53  11   Q.   And you have the ability to transition back into the
10:46:56  12   selected reserve that you are currently a part of back to and
10:47:00  13   from the IRR to the selected reserve as services allow; is
10:47:05  14   that correct?
10:47:05  15   A.   I spoke to Lieutenant Colonel Kojack about that, and he
10:47:09  16   said that, pending decisions in the future, that I could
10:47:13  17   request from him, if I'm still in the IRR after they
10:47:20  18   discharge me, I would have to go back through a recruiter.
10:47:24  19   If he has a need for my service or the recruiter can find a
10:47:28  20   placement for me, then they would be able to transfer me
10:47:31  21   back into the Active Reserves.
10:47:32  22   Q.   And the IRR itself is not discharge, correct?
10:47:37  23   A.   No, ma'am.  It's a -- it's like a -- it's way that they
10:47:45  24   can -- honestly, ma'am, I don't understand why we even have
10:47:48  25   an IRR, but it's just a placeholder, I guess, between active
```

10:47:53  1   reserve service and not being a part of the military.

10:47:57  2   **Q.**   Are you aware that you can remain eligible for promotion

10:48:00  3   even when you are in IRR?

10:48:01  4   **A.**   I'm not aware of that, ma'am.

10:48:03  5   **Q.**   Do you have any reason to dispute that that's the case?

10:48:05  6   **A.**   No, ma'am.

10:48:06  7   **Q.**   And that at the end of your military obligation, if you

10:48:11  8   are in the IRR, you can also still be honorably discharged.

10:48:15  9   Are you aware of that?

10:48:17  10  **A.**   I am not aware of the specifics of how discharges from

10:48:20  11  the IRR work.

10:48:22  12  **Q.**   But you don't --

10:48:22  13  **A.**   I don't dispute that.

10:48:23  14  **Q.**   -- dispute that?  You have no reason to dispute that?

10:48:26  15  **A.**   No, I have no reason to dispute that.

10:48:29  16  **Q.**   You haven't been court-martialed, have you?

10:48:31  17  **A.**   No, ma'am, not to my knowledge.

10:48:35  18  **Q.**   You haven't been notified that you had --

10:48:35  19  **A.**   No, ma'am.

10:48:35  20  **Q.**   You haven't been threatened with prison?

10:48:37  21  **A.**   No, ma'am.

10:48:39  22  **Q.**   Members of the reserve are held to the same medical

10:48:44  23  readiness and training standards as Active Duty Reserves; is

10:48:48  24  that right?

10:48:48  25  **A.**   Yes, ma'am.  Sometimes there are longer periods for

10:48:52  1   compliance, but all together, yes.

10:48:56  2   **Q.**   Are the requirements --

10:48:58  3   **A.**   The requirements remain the same.  It's just sometimes

10:49:00  4   the timelines are different.

10:49:01  5   **Q.**   And the requirements remain the same because the purpose

10:49:04  6   of the reserve is to be ready to mobilize and back-fall for

10:49:08  7   active duty if the need arises; is that right?

10:49:11  8   **A.**   Yes, ma'am.

10:49:12  9   **Q.**   And if you were called for active duty, you would be

10:49:15  10  serving alongside other active duty service members, correct?

10:49:19  11  **A.**   Yes, ma'am.  As well as reservists and national guards.

10:49:22  12  **Q.**   Right.  That would be on a full-time basis in this case?

10:49:25  13  **A.**   If I were called up to active service, yes, ma'am.

10:49:27  14  **Q.**   You could also be deployed overseas, right?

10:49:29  15  **A.**   Yes, ma'am.

10:49:30  16  **Q.**   And you are required to be deployment ready?

10:49:33  17  **A.**   Yes, ma'am.

10:49:33  18  **Q.**   In a deployment environment, is it fair to say that

10:49:38  19  service members are living in the same area?

10:49:42  20  **A.**   Yes, ma'am.

10:49:43  21  **Q.**   In close proximity?

10:49:45  22  **A.**   They differ from place to place, location to location,

10:49:49  23  but, you know, you are all on the same base.  You are not in

10:49:52  24  apartment buildings in town usually.

10:49:55  25  **Q.**   And are you aware also that the medical facilities in a

| 10:50:00 | 1 | deployed location can be pretty limited? |
|---|---|---|

10:50:00   1   deployed location can be pretty limited?

10:50:02   2   **A.**   A lot of times they are, ma'am, and sometimes they are

10:50:04   3   better at that location.

10:50:05   4   **Q.**   But there are also locations where they are significantly

10:50:08   5   worse than --

10:50:09   6   **A.**   Yes, ma'am.

10:50:10   7   **Q.**   -- at-home locations, correct?

10:50:11   8   **A.**   Of course.

10:50:12   9   **Q.**   You testified earlier about some medical exemptions.  Do

10:50:29   10   you remember that?

10:50:29   11   **A.**   Would you remind me please, ma'am?

10:50:35   12   **Q.**   Well, your counsel asked you about whether you were aware

10:50:38   13   that medical exemptions have been granted through the Air

10:50:40   14   Force?

10:50:40   15   **A.**   Oh, yes, ma'am.

10:50:41   16   **Q.**   And are you aware that the medical exemptions that have

10:50:44   17   been granted are all temporary in nature?

10:50:46   18   **A.**   Ma'am, I am just aware that there have been medical and

10:50:51   19   administrative exemptions given in the Air Force.  I know

10:50:54   20   nothing of the specifics.

10:50:56   21   **Q.**   Okay.  So you don't have any personal knowledge of the

10:50:57   22   actual specific circumstances in which they are requested or

10:50:58   23   granted or duties required of the individuals who received

10:51:02   24   them, anything like that?

10:51:03   25   **A.**   No.  I just know that there are individuals that have

POFFENBARGER - CROSS (YANG)                              36

10:51:08    1    received medical and administrative exemptions who are

10:51:11    2    actively serving in their jobs in the Air Force right now.

10:51:16    3    Q.    But you don't know whether those exemptions are temporary

10:51:17    4    or permanent?

10:51:17    5    A.    I don't know, ma'am.

10:51:19    6    Q.    And would you have any reason to dispute that the

10:51:22    7    exemptions are, in fact, temporary?

10:51:25    8                 MR. WIEST:  Objection, Your Honor.  He said he

10:51:27    9    doesn't know.

10:51:27   10                 THE COURT:  I agree.  Sustained.

10:51:30   11    BY MS. YANG:

10:51:31   12    Q.    Do you ever take over-the-counter medications like

10:51:35   13    ibuprofen, aspirin, or Tylenol?

10:51:39   14    A.    Yes, ma'am.

10:51:39   15    Q.    When was the last time that you took one of those over-

10:51:39   16    the-counter medications?

10:51:40   17    A.    Sometime last year maybe.  Maybe while I was OTS

10:51:48   18    possibly, after all the exercising that we did.

10:51:51   19    Q.    Did you know that those medications also use cell lines

10:51:54   20    that trace back to elective abortions?

10:51:58   21                 MR. WIEST:  Object, Your Honor.  I don't think the

10:52:01   22    government's put any evidence on about the contents of these

10:52:03   23    products, and so I don't -- you know, we're assuming things

10:52:05   24    that aren't in evidence.

10:52:07   25                 THE COURT:  Counsel?

| | | |
|---|---|---|
| 10:52:08 | 1 | MS. YANG: Your Honor, given the limited record that |
| 10:52:10 | 2 | we have had the opportunity to establish here before this |
| 10:52:12 | 3 | preliminary injunction hearing, you know, we submit that we |
| 10:52:15 | 4 | would be able to submit evidence to support this in the normal |
| 10:52:19 | 5 | course of proceedings. |
| 10:52:20 | 6 | And further, that this goes to the substantial burden on |
| 10:52:24 | 7 | Second Lieutenant Poffenbarger's religious beliefs that he's |
| 10:52:29 | 8 | testified to. |
| 10:52:31 | 9 | THE COURT: There's been no -- there's been nothing |
| 10:52:35 | 10 | submitted in the briefing at this point in time with regard to |
| 10:52:37 | 11 | that, is there? |
| 10:52:38 | 12 | MR. WIEST: There's not, Your Honor. |
| 10:52:41 | 13 | MS. YANG: No, Your Honor. |
| 10:52:53 | 14 | MR. WIEST: Your Honor, this is a factual matter. |
| 10:52:55 | 15 | I'm not sure that it's true. So that's the real issue. |
| 10:52:58 | 16 | THE COURT: Thank you. |
| 10:52:59 | 17 | Lieutenant? |
| 10:53:02 | 18 | THE WITNESS: Yes, Your Honor. |
| 10:53:03 | 19 | THE COURT: If you took this medication, did you |
| 10:53:06 | 20 | have any idea if that is true or not? |
| 10:53:08 | 21 | THE WITNESS: I have never heard that, and I have no |
| 10:53:10 | 22 | knowledge of that, Your Honor. |
| 10:53:10 | 23 | THE COURT: Move on. |
| 10:53:14 | 24 | BY MS. YANG: |
| 10:53:14 | 25 | **Q.** What is your salary from your civilian employment? |

POFFENBARGER - CROSS (YANG)                                38

10:53:17  1    **A.**   I haven't done my taxes yet this year, but somewhere in

10:53:21  2    the neighborhood of $60,000, ma'am.

10:53:23  3    **Q.**   Do you receive retirement benefits from that employment?

10:53:26  4    **A.**   They contribute I think it's 3 percent match to my IRA.

10:53:32  5    **Q.**   Do you receive healthcare benefits through that

10:53:35  6    employment?

10:53:35  7    **A.**   No, ma'am.

10:53:35  8    **Q.**   What is your salary from your service in the reserve?

10:53:38  9    **A.**   I think last year it totaled 5 or $6,000, something

10:53:46  10   like that.  I'm not sure.  I haven't done my taxes yet.

10:53:51  11   **Q.**   Is it fair to say that you will not get the COVID vaccine

10:53:56  12   because you believe it violates your religious beliefs?

10:54:00  13   **A.**   I will not take these COVID vaccines because they are

10:54:07  14   against my religious beliefs, ma'am.

10:54:09  15   **Q.**   Has getting the letter of reprimand changed your mind

10:54:13  16   about getting the current COVID vaccine?

10:54:17  17   **A.**   No, ma'am.

10:54:17  18   **Q.**   Would being placed in the Individual Ready Reserve change

10:54:18  19   your mind about getting the COVID vaccine?

10:54:20  20   **A.**   No, ma'am.

10:54:20  21   **Q.**   And is there any scenario that you can think of as of

10:54:24  22   right now in which you could get the existing COVID vaccine?

10:54:28  23   **A.**   No, ma'am.

10:54:29  24   **Q.**   Thank you.

10:54:40  25          THE COURT:  Is that all, Counsel?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

POFFENBARGER - REDIRECT (WIEST)                    39

| | | |
|---|---|---|
| 10:54:41 | 1 | MR. WIEST: I have brief redirect. |
| 10:54:43 | 2 | THE COURT: Is that all? |
| 10:54:43 | 3 | MS. YANG: Oh, yes. Thank you. |
| 10:54:44 | 4 | THE COURT: Redirect with regard to those matters |
| 10:54:46 | 5 | that were covered. |
| 10:54:49 | 6 | MR. WIEST: Right. Within the scope. |
| 10:54:49 | 7 | **REDIRECT EXAMINATION** |
| 10:54:50 | 8 | BY MR. WIEST: |
| 10:54:51 | 9 | **Q.** Sir, just real quick, have you previously been infected |
| 10:54:55 | 10 | with COVID-19? |
| 10:54:56 | 11 | **A.** Yes, sir. |
| 10:54:57 | 12 | **Q.** And you told the Air Force about that when that occurred? |
| 10:55:00 | 13 | **A.** I did, sir. |
| 10:55:00 | 14 | **Q.** Let me ask, you are currently in the intelligence officer |
| 10:55:07 | 15 | billet, correct? |
| 10:55:08 | 16 | **A.** That's correct. |
| 10:55:08 | 17 | **Q.** Were people able to perform those jobs in the |
| 10:55:11 | 18 | intelligence officer billet from March of 2020 through August |
| 10:55:18 | 19 | of 2021 notwithstanding the fact that there was no COVID |
| 10:55:23 | 20 | vaccine that was available? |
| 10:55:23 | 21 | **A.** Yes, they did. |
| 10:55:25 | 22 | **Q.** Was mission accomplishment an issue as a result of that? |
| 10:55:28 | 23 | **A.** Not to my knowledge. I believe they excelled very well |
| 10:55:32 | 24 | during that time. |
| 10:55:32 | 25 | **Q.** You had attended OTS without vaccination, correct? |

POFFENBARGER - REDIRECT (WIEST)                    40

10:55:37  1    A.    That's correct, sir.

10:55:38  2    Q.    Do you know approximately how -- what the percentage of

10:55:43  3    the class was that was not vaccinated?

10:55:45  4    A.    I don't know, sir, but on one of the initial dates when

10:55:49  5    we were there, the commander asked everyone who had been

10:55:54  6    vaccinated to raise their hands.  And from where I was

10:55:56  7    sitting, it looked to be approximately 50/50.  It may have

10:56:00  8    been higher but --

10:56:01  9    Q.    OTS is a training environment where at least initially

10:56:04  10   there is yelling, screaming, everything that people partially

10:56:08  11   envision with a boot camp-type environment, correct?

10:56:11  12   A.    Correct.

10:56:11  13   Q.    Close quarters, correct?

10:56:13  14   A.    Very close, sir.

10:56:14  15   Q.    Room and uniform standards that have to be maintained,

10:56:17  16   correct?

10:56:17  17   A.    That's correct.

10:56:18  18   Q.    Intense environment, correct?

10:56:20  19   A.    Very, very intense.

10:56:22  20   Q.    And the Air Force was able to accomplish that with only a

10:56:24  21   50 percent vaccination rate in your OTS class, correct?

10:56:28  22   A.    As I said, sir, I don't know what the percentage was,

10:56:31  23   but, yes, we accomplished it, and I think we did a very good

10:56:35  24   job.

10:56:35  25   Q.    Let's talk about the intelligence school.  Do you know if

POFFENBARGER - REDIRECT (WIEST)                    41

10:56:37  1   the Air Force was running the intelligence school operations

10:56:40  2   for people to attend intelligence school from March of 2020

10:56:43  3   through, say, September of '21?

10:56:45  4   A.   Yes, sir, I believe they were.

10:56:46  5   Q.   So the existence of COVID-19 did not preclude people from

10:56:51  6   being able to go through intelligence school?

10:56:55  7   A.   No, sir.  I think they put mitigation efforts into

10:56:57  8   effect, but it kept going, and I think everyone got trained

10:57:01  9   as they needed to be.

10:57:02  10  Q.   Was the Air Force able to deploy into forward operating

10:57:06  11  environments from March of 2020 through September of 2021

10:57:09  12  notwithstanding the inability of a vaccine?

10:57:11  13  A.   Yes, we did, sir.

10:57:12  14  Q.   And I want to talk just briefly about the people that you

10:57:17  15  interact with.  There is a mandate that came down from

10:57:21  16  Secretary Kendall to receive a vaccine.

10:57:23  17  A.   Yes, sir.

10:57:24  18  Q.   You're aware of it.  In fact, we are here about it today,

10:57:28  19  right?

10:57:28  20  A.   Yes, sir.

10:57:29  21  Q.   My understanding -- maybe you can tell me, is it your

10:57:33  22  understanding that the Air Force has a vaccination rate of

10:57:36  23  over 95 percent?

10:57:37  24  A.   I have been told that, and everyone I know in my unit

10:57:42  25  has been vaccinated.

| | | |
|---|---|---|
| 10:57:42 | 1 | **Q.**   Okay.  So the people that you would be interacting with |
| 10:57:43 | 2 | that government counsel is asking you about are actually |
| 10:57:47 | 3 | vaccinated? |
| 10:57:48 | 4 | **A.**   Yes, sir, they all are. |
| 10:57:49 | 5 | **Q.**   Okay.  And, finally, government counsel asked you about |
| 10:57:52 | 6 | whether or not you were threatened with court-martial. |
| 10:57:55 | 7 | Can you turn to Exhibit 8 with me, please?  Go to the |
| 10:58:07 | 8 | second page. |
| 10:58:12 | 9 | You with me? |
| 10:58:12 | 10 | **A.**   Yes, sir. |
| 10:58:13 | 11 | **Q.**   Paragraph 2.  This is from Colonel Smith, your commander. |
| 10:58:17 | 12 | And I understand that he may be a special court-martial |
| 10:58:20 | 13 | commanding authority, correct? |
| 10:58:21 | 14 | **A.**   That's my understanding, sir. |
| 10:58:22 | 15 | **Q.**   Okay.  "You are hereby reprimanded!  As a member of the |
| 10:58:29 | 16 | United States Air Force, it is your duty to obey the lawful |
| 10:58:30 | 17 | orders from your commander.  In the future, I expect you to |
| 10:58:33 | 18 | obey the orders of your commander and adhere to all laws and |
| 10:58:37 | 19 | Air Force standards." |
| 10:58:37 | 20 | Here's the key -- and I just want to make sure I am |
| 10:58:40 | 21 | reading this right.  Actually, why don't you read that very |
| 10:58:42 | 22 | next sentence? |
| 10:58:43 | 23 | **A.**   Sir, it says, "Further misconduct may result in more |
| 10:58:46 | 24 | severe action." |
| 10:58:48 | 25 | **Q.**   Is a general court-martial more severe than a letter of |

10:58:51  1    reprimand?

10:58:52  2    **A.**   Yes, sir.

10:58:52  3    **Q.**   Is a special court-marital more severe than a letter of

10:58:54  4    reprimand?

10:58:55  5    **A.**   Yes, sir.

10:58:55  6    **Q.**   How about an Article 15, is that more severe than a

10:58:59  7    letter of reprimand?

10:59:00  8    **A.**   Yes, sir.

10:59:00  9    **Q.**   And so it might not have been completely accurate that

10:59:03  10   you were not, in fact, threatened with a court-martial, right?

10:59:05  11   **A.**   Now that I think about it, sir, I think that that

10:59:08  12   letter actually does state that.

10:59:09  13   **Q.**   Thank you.

10:59:10  14        MR. WIEST:  Nothing further, Your Honor.

10:59:11  15        THE COURT:  Anything further with regard to those

10:59:12  16   few questions, counsel?

10:59:15  17        MS. YANG:  Just very quickly, Your Honor.

10:59:20  18        THE COURT:  Okay.

10:59:20  19                    **RECROSS-EXAMINATION**

10:59:20  20   BY MS. YANG:

10:59:22  21   **Q.**   Sir, you mentioned officer training school just now?

10:59:24  22   **A.**   Yes, ma'am.

10:59:24  23   **Q.**   Officer training school did not occur in a secure

10:59:27  24   facility, correct?

10:59:28  25   **A.**   No, I don't believe there are any secure facilities

POFFENBARGER - RECROSS (YANG)                          44

10:59:31   1   anywhere on the OTS campus.

10:59:33   2   **Q.**   And OTS also did not occur in a deployed environment?

10:59:36   3   **A.**   No, ma'am.

10:59:36   4   **Q.**   You testified that you have previously been infected with

10:59:38   5   COVID-19.  How many times?

10:59:40   6   **A.**   I don't know, ma'am.  I would assume one time.

10:59:46   7   **Q.**   To the best of your knowledge?

10:59:47   8   **A.**   To the best of my knowledge.

10:59:48   9   **Q.**   When was that?

10:59:49   10   **A.**   That would have been November, December 2020.

10:59:53   11   **Q.**   Did you have any symptoms?

10:59:55   12   **A.**   Yes, ma'am.

10:59:55   13   **Q.**   What was the severity?

10:59:57   14   **A.**   I don't know.

11:00:02   15       Does the Court want me to go into detail on my

11:00:05   16   sickness?

11:00:06   17           THE COURT:  I think the question is whether -- what

11:00:11   18   was the severity.  Was it, did you consider it severe or did

11:00:20   19   you consider it asymptomatic?  What did you consider it?

11:00:22   20           THE WITNESS:  Your Honor, I would have considered it

11:00:23   21   a bad cold.

11:00:24   22           THE COURT:  A what?

11:00:25   23           THE WITNESS:  A very bad cold.

11:00:27   24           THE COURT:  A very bad cold.

11:00:27   25       I'm sorry.  Go ahead.

POFFENBARGER - RECROSS (YANG)                                    45

| | | |
|---|---|---|
| 11:00:28 | 1 | BY MR. WIEST: |
| 11:00:28 | 2 | **Q.**   How many days did you experience these symptoms? |
| 11:00:32 | 3 | **A.**   Maybe five, ma'am. |
| 11:00:32 | 4 | **Q.**   Are you aware that the CDC recommends that people who |
| 11:00:37 | 5 | have previously been infected nevertheless get vaccinated? |
| 11:00:40 | 6 | **A.**   I have been told that, ma'am. |
| 11:00:41 | 7 | **Q.**   Do you know what your current level of COVID-19 |
| 11:00:45 | 8 | antibodies is? |
| 11:00:45 | 9 | **A.**   No, ma'am. |
| 11:00:46 | 10 | **Q.**   Have you ever taken an antibody test? |
| 11:00:49 | 11 | **A.**   Yes, ma'am. |
| 11:00:50 | 12 | **Q.**   And when was the last time you took an antibody test? |
| 11:00:53 | 13 | **A.**   The antibody test was in January, I believe. |
| 11:00:57 | 14 | **Q.**   Of this year or last year? |
| 11:00:58 | 15 | **A.**   This year, ma'am.  It was -- actually, yes, I do |
| 11:01:02 | 16 | remember.  It was the week that I was there.  So it would |
| 11:01:07 | 17 | have been the week of the 3rd of January, whenever that was, |
| 11:01:12 | 18 | the 3rd through the 7th.  It was while I was at Wright-Patt. |
| 11:01:15 | 19 | **Q.**   Has your physician told you that as a result of your |
| 11:01:19 | 20 | previous infection or the results of your antibody test that |
| 11:01:23 | 21 | you are now immune from COVID-19? |
| 11:01:25 | 22 | **A.**   I have not spoken to a physician about that matter. |
| 11:01:28 | 23 | **Q.**   Has any medical provider told you that as a result of |
| 11:01:31 | 24 | your infection or your antibody test results that you are now |
| 11:01:38 | 25 | immune from COVID-19? |

| | | |
|---|---|---|
| 11:01:38 | 1 | **A.**   Ma'am, I have not spoken to any medical professionals |
| 11:01:41 | 2 | about my immunity levels or anything like that. |
| 11:01:44 | 3 | **Q.**   Thank you. |
| 11:01:45 | 4 | MS. YANG:  Nothing further. |
| 11:01:47 | 5 | MR. WIEST:  Nothing further, Your Honor. |
| 11:01:48 | 6 | THE COURT:  Any reason this witness cannot be |
| 11:01:51 | 7 | excused then? |
| 11:01:52 | 8 | MR. WIEST:  No, Your Honor.  He can be excused. |
| 11:01:54 | 9 | MS. YANG:  No, Your Honor. |
| 11:01:54 | 10 | THE COURT:  Thank you very much. |
| 11:01:55 | 11 | THE WITNESS:  Thank you, Your Honor. |
| 11:02:01 | 12 | THE COURT:  Counsel for plaintiff, any other |
| 11:02:02 | 13 | witnesses? |
| 11:02:04 | 14 | MR. WIEST:  No, Your Honor. |
| 11:02:05 | 15 | THE COURT:  Do you wish to move exhibits? |
| 11:02:06 | 16 | MR. WIEST:  Yes, Your Honor, I wish to move the |
| 11:02:08 | 17 | admission of Exhibits 1 through 8. |
| 11:02:10 | 18 | THE COURT:  Any objections? |
| 11:02:11 | 19 | MS. YANG:  No, Your Honor. |
| 11:02:13 | 20 | THE COURT:  They will be admitted without objection. |
| 11:02:13 | 21 | (Plaintiff Exhibits 1 through 8, respectively, were |
| 11:02:13 | 22 | received in evidence.) |
| 11:02:17 | 23 | THE COURT:  Any witnesses or testimony to be |
| 11:02:18 | 24 | presented, or evidence to be presented from the defendants? |
| 11:02:21 | 25 | MR. CARMICHAEL:  No, Your Honor. |

| | | |
|---|---|---|
| 11:02:27 | 1 | THE COURT: So I think we are down to elections. |
| 11:02:30 | 2 | And again, I would state for the record that counsel for both |
| 11:02:32 | 3 | the plaintiff and the defendants have submitted a great deal |
| 11:02:37 | 4 | of information. The Court has accommodated that by even |
| 11:02:42 | 5 | extending its length of the briefing matters. And the Court |
| 11:02:49 | 6 | is well versed in the positions and the issues in the case, |
| 11:02:57 | 7 | and now with the supplementing by Mr. Poffenbarger, his |
| 11:03:00 | 8 | testimony, the Court would indicate that it would be willing |
| 11:03:05 | 9 | to entertain at this point in time argument. |
| 11:03:11 | 10 | What I would suggest is we'll allow counsel for plaintiff |
| 11:03:15 | 11 | to present their argument; counsel for the defendants to |
| 11:03:21 | 12 | present their argument; then a short reply, if that's |
| 11:03:26 | 13 | necessary, on behalf of the plaintiff. |
| 11:03:30 | 14 | Any questions, counsel, how we want to proceed? |
| 11:03:34 | 15 | MR. CARMICHAEL: No, Your Honor. |
| 11:03:35 | 16 | MR. WIEST: No, Your Honor. |
| 11:03:36 | 17 | THE COURT: Counsel for plaintiff. |
| 11:03:39 | 18 | Counsel for plaintiff, or before we get started -- well, |
| 11:03:47 | 19 | no. I'll let you go ahead. I'll let you go ahead. |
| 11:03:49 | 20 | MR. WIEST: Your Honor, it was interesting, |
| 11:03:50 | 21 | Mr. Bruns and I were standing outside this morning, and we saw |
| 11:03:55 | 22 | a quote from Judge Rice on the wall that said "The price of |
| 11:03:59 | 23 | freedom, in truth -- is, in truth, eternal vigilance." And |
| 11:04:04 | 24 | Judge Rice was referring, of course, to the constitutional |
| 11:04:08 | 25 | republic that we take an oath too as attorneys, as judges, and |

11:04:14  1    as military officers.

11:04:17  2         Your Honor, this is a case involving an act of Congress,

11:04:21  3    the Religious Freedom Restoration Act, and this is a case

11:04:24  4    involving the First Amendment and the Free Exercise clause.

11:04:27  5         And in both of those instances, I think it is without

11:04:32  6    dispute that the Air Force has granted thousands of medical

11:04:37  7    and administrative exemptions and all but a handful of

11:04:43  8    religious exemptions.  And there is some context on that that

11:04:47  9    came out of Florida that we supplemented yesterday that

11:04:50  10   suggests that those, in fact, are people that are at the very

11:04:54  11   end of their term of service, and so if they are a month or

11:04:58  12   two from terminal leave, yeah, they will grant them one, but

11:05:00  13   otherwise, no.

11:05:01  14        And it's interesting, and the reason, Your Honor, that I

11:05:03  15   think it's interesting is the burden here.  Does Lieutenant

11:05:10  16   Poffenbarger have a sincerely held religious belief?  Well, we

11:05:14  17   know that he does.  In fact, the Air Force hasn't really

11:05:16  18   disputed it.  In fact, you know, General Scobee, who reviewed

11:05:20  19   his request, acknowledged it.

11:05:21  20        Do they sincerely -- or do they substantially burden it?

11:05:24  21   I don't think there is a dispute about that either.

11:05:27  22        So the question is whether or not what they are doing

11:05:31  23   here meets the narrow tailoring standard.  And the U.S.

11:05:36  24   Supreme Court has been pretty clear that it's their burden.

11:05:37  25   And that's the *Tandon versus Newsom* case.  And that's the

11:05:41  1    government's burden.

11:05:43  2         And I'll just read a passage from it.  "Where the

11:05:45  3    government permits other activities to proceed with

11:05:47  4    precautions, it must show that the religious exercise at issue

11:05:50  5    is more dangerous than those activities, even when the same

11:05:54  6    precautions are applied."

11:05:55  7         One would think the government would have come in here

11:05:57  8    and given context of the thousands of administrative and

11:06:01  9    religious exemptions that they have granted -- that they are

11:06:04  10   in other career fields; that they don't involve the same job

11:06:08  11   duties or same people interactions that Lieutenant

11:06:11  12   Poffenbarger did.  But, Your Honor, the record doesn't

11:06:13  13   demonstrate the government meeting that burden at all.  And I

11:06:16  14   want to be clear, it is the government's burden.  The U.S.

11:06:19  15   Supreme Court has said so.

11:06:22  16        We look at *Fulton*.  *Fulton* talks about religious

11:06:26  17   accommodations and exemptions, an individualized

11:06:31  18   consideration.  And that's what we've got here, Your Honor.

11:06:33  19   We've got individualized consideration of medical and

11:06:38  20   administrative exemptions and individualized consideration of

11:06:39  21   religious exemptions.  And *Fulton* speaks to the fact that what

11:06:42  22   we are dealing with here is strict scrutiny.

11:06:44  23        And, finally, Your Honor, we've got the Sixth Circuit's

11:06:48  24   decision in *Dahl* issued just a few months ago, *Dahl versus*

11:06:51  25   *Board of Trustees of Western Michigan University.*  And that

11:06:53 1    was a vaccine case. That was a vaccine religious exemption

11:06:58 2    case. And that was a case, in my estimation, that is on all

11:07:02 3    fours with this case in which we're dealing with a lack of

11:07:07 4    religious exemptions. And at least in that case they -- the

11:07:10 5    defendants came in and said, "Well, listen. We're not even

11:07:14 6    granting medical and administrative."

11:07:16 7       And what the Court said was, "We don't care. You got a

11:07:19 8    system to process it. That's good enough for us. Strict

11:07:23 9    scrutiny applies." That's what the Sixth Circuit says.

11:07:27 10       And so, Your Honor, when we look at the language that the

11:07:30 11    Sixth Circuit came out with in *Dahl* that talks about, for

11:07:33 12    instance, that if you're allowing these medical and

11:07:38 13    administrative exemptions, you know, I don't know how the

11:07:41 14    government meets its burden -- and it is its burden -- under

11:07:44 15    strict scrutiny. If it's good enough for medical and

11:07:47 16    administrative purposes, it's good enough for religious

11:07:50 17    purposes.

11:07:51 18       And I realize Colonel Poel in his declaration says that

11:07:54 19    they are saving the medical and administrative exemptions, you

11:07:57 20    know; that the reason they are not granting the religious

11:08:00 21    exemptions in paragraph 7 of his declaration is they want to

11:08:03 22    save them. Your Honor, with all due respect, that is an

11:08:06 23    admission of religious discrimination. That is an admission

11:08:11 24    of a violation of the United States Constitution.

11:08:13 25       And I know we have seen case law from the defendants that

| | | |
|---|---|---|
| 11:08:16 | 1 | suggest that, oh, it's the military.  It's different.  We need |
| 11:08:18 | 2 | to somehow defer. |
| 11:08:20 | 3 | But I'm back to some language in *Fulton* that talks about |
| 11:08:23 | 4 | deference.  And I wanted to just leave the Court with this |
| 11:08:27 | 5 | when it talks about deference because of the exemptions.  And |
| 11:08:32 | 6 | this begins in the *Fulton* decision by the U.S. Supreme |
| 11:08:35 | 7 | Court -- and I know we're not in the U.S. Reports because it's |
| 11:08:38 | 8 | a relatively recent case, was issued in 2021 -- at 1878.  141 |
| 11:08:45 | 9 | Supreme Court 1878 is the pin cite.  "No matter the level of |
| 11:08:50 | 10 | deference we extend to the government" -- in that case the |
| 11:08:52 | 11 | city -- "the inclusion of a formal system of entirely |
| 11:08:54 | 12 | discretionary exemptions renders the contractual and |
| 11:08:58 | 13 | nondiscrimination requirement not generally applicable." |
| 11:09:01 | 14 | Your Honor, *Fulton* also talks about the creation of a |
| 11:09:08 | 15 | formal -- and I'm reading again at 1879 -- "The creation of a |
| 11:09:14 | 16 | formal mechanism for granting exceptions renders a policy not |
| 11:09:17 | 17 | generally applicable, regardless whether any exemptions have |
| 11:09:20 | 18 | been given, because it invites the governments to decide what |
| 11:09:22 | 19 | reasons for not complying with the policy are worthy of |
| 11:09:22 | 20 | solicitude." |
| 11:09:27 | 21 | So we are clearly in strict scrutiny.  We are clearly |
| 11:09:31 | 22 | looking at whether or not the government has met a substantial |
| 11:09:32 | 23 | burden of strict scrutiny.  And they say, well, COVID vaccines |
| 11:09:36 | 24 | are important.  They help protect public health.  He might run |
| 11:09:42 | 25 | into, you know, other people.  He might need to be in a |

| | | |
|---|---|---|
| 11:09:44 | 1 | training facility with other people. I am sure you are going |
| 11:09:47 | 2 | to hear all of that in a couple minutes. |
| 11:09:49 | 3 | No doubt. We don't disagree with all that. But the |
| 11:09:53 | 4 | problem is the government themselves have acknowledged that |
| 11:09:56 | 5 | that doesn't matter when it comes to administrative and |
| 11:10:00 | 6 | medical exemptions. And if you are going to grant that, you |
| 11:10:04 | 7 | have to treat the religious exemptions the exact same way. |
| 11:10:08 | 8 | And granting thousands of them, whether you want to call them |
| 11:10:12 | 9 | temporary or not, fine, grant Lieutenant Poffenbarger a |
| 11:10:12 | 10 | temporary exemption until a vaccine comes out that doesn't |
| 11:10:16 | 11 | contain aborted fetal tissue and then he will go and he will |
| 11:10:19 | 12 | get it. Treat him the same. That's all we are asking for. |
| 11:10:21 | 13 | The government has never come forward and explained why |
| 11:10:26 | 14 | they can grant thousands of those and meet military readiness |
| 11:10:26 | 15 | and force protection requirements, thousands of administrative |
| 11:10:27 | 16 | or medical exemptions, or to explain the context or to |
| 11:10:30 | 17 | distinguish the context. They have never done it. There is |
| 11:10:33 | 18 | no proof in the record. It was their burden. I'm shocked |
| 11:10:35 | 19 | they didn't put a witness on to explain it today. Yet here we |
| 11:10:39 | 20 | are. It's their burden. We put on the only witness, and we |
| 11:10:43 | 21 | met our burden showing that he had a sincere religious belief, |
| 11:10:46 | 22 | and they substantially averted it. |
| 11:10:49 | 23 | So, Your Honor, based on this record, in part, I think |
| 11:10:51 | 24 | that there is a growing trend of district court decisions |
| 11:10:53 | 25 | coming out granting these preliminary injunctions that is |

| | | |
|---|---|---|
| 11:10:58 | 1 | weaved in; that there is a tidal wave of these coming forward, |
| 11:10:59 | 2 | and that's because the government is systemically grant -- |
| 11:11:02 | 3 | systemically violating the Constitution and RFRA. |
| 11:11:05 | 4 | And so, you know, there is either going to either |
| 11:11:08 | 5 | continue to be piecemeal or at some point hopefully maybe |
| 11:11:12 | 6 | somebody will give permanent injunction or perhaps a |
| 11:11:16 | 7 | preliminary injunction that extends to all of the Air Force, |
| 11:11:18 | 8 | to the point that we can start to follow the Constitution and |
| 11:11:21 | 9 | RFRA because it is a systemic problem right now that, you |
| 11:11:24 | 10 | know, this double standard, and it's got to stop.  It's |
| 11:11:26 | 11 | illegal under Sixth Circuit precedent.  It's illegal under |
| 11:11:29 | 12 | U.S. Supreme Court precedent. |
| 11:11:30 | 13 | Your Honor, with that I'm happy to take any questions the |
| 11:11:33 | 14 | Court may have.  Judge, any questions? |
| 11:11:39 | 15 | THE COURT:  No, not at this point in time. |
| 11:11:41 | 16 | MR. WIEST:  Thank you, Your Honor. |
| 11:11:44 | 17 | THE COURT:  Thank you. |
| 11:11:45 | 18 | Counsel.  Counsel, before you get started, I just want to |
| 11:11:52 | 19 | confirm some things that the Court has taken from the records. |
| 11:11:59 | 20 | You are familiar -- you are familiar with the Navy SEAL 1 |
| 11:12:04 | 21 | case, correct? |
| 11:12:05 | 22 | MR. CARMICHAEL:  Yes, very familiar.  I am actually |
| 11:12:07 | 23 | a counsel in that case. |
| 11:12:14 | 24 | THE COURT:  Well, good.  At this point in time, you |
| 11:12:17 | 25 | are not disputing the data that was contained in Colonel Jason |

| 11:12:20 | 1 | Holbrook's declaration pursuant to the Court's order down |
| 11:12:25 | 2 | there? |
| 11:12:25 | 3 | MR. CARMICHAEL: No, no. There is updated data |
| 11:12:28 | 4 | there, and then there is a cover -- there is a cover letter |
| 11:12:33 | 5 | explaining the data, but, no, that's Air Force data. |
| 11:12:40 | 6 | THE COURT: And can you -- can you just confirm for |
| 11:12:42 | 7 | me that the disciplinary actions that the Air Force has taken |
| 11:12:48 | 8 | now against Lieutenant Poffenbarger is that, to date, they |
| 11:12:57 | 9 | issued him a letter of reprimand on January the 6th which was |
| 11:13:01 | 10 | then rescinded, a new letter of reprimand was issued on |
| 11:13:05 | 11 | January the 10th, and then they issued him a notification of |
| 11:13:11 | 12 | denial of participation which excused him from his weekend |
| 11:13:16 | 13 | reserve duty and placed him in a no-pay/no-point status; is |
| 11:13:21 | 14 | that correct? |
| 11:13:21 | 15 | MR. CARMICHAEL: That's correct. |
| 11:13:22 | 16 | THE COURT: All right. Now, does the notification |
| 11:13:25 | 17 | of denial of participation then excuse him from all of his |
| 11:13:30 | 18 | duties with the Air Force so that he does not get paid or |
| 11:13:35 | 19 | acquire military points because he isn't actually doing the |
| 11:13:38 | 20 | work? |
| 11:13:39 | 21 | MR. CARMICHAEL: Yes, that's correct. |
| 11:13:40 | 22 | THE COURT: And are there any other actions at this |
| 11:13:43 | 23 | point in time that the Air Force has taken against Lieutenant |
| 11:13:46 | 24 | Poffenbarger? |
| 11:13:47 | 25 | MR. CARMICHAEL: Not yet. You know, there -- |

| | | |
|---|---|---|
| 11:13:49 | 1 | THE COURT: That's my next question. My next |
| 11:13:52 | 2 | question is, what disciplinary actions would the Air Force be |
| 11:13:57 | 3 | planning to take against Lieutenant Poffenbarger setting aside |
| 11:14:02 | 4 | the possibility of this Court's different rulings? |
| 11:14:06 | 5 | MR. CARMICHAEL: The Air Force does not consider |
| 11:14:08 | 6 | transfer to the IRR discipline. However, that is what they |
| 11:14:12 | 7 | are planning to do. They would move him to -- I mean, I don't |
| 11:14:16 | 8 | want to get ahead of the fact -- |
| 11:14:18 | 9 | THE COURT: I understand. |
| 11:14:19 | 10 | MR. CARMICHAEL: -- with the letter of reprimand, |
| 11:14:21 | 11 | his response, the consideration of that response, but, you |
| 11:14:24 | 12 | know, I think it's fair to assume that he will ultimately be |
| 11:14:27 | 13 | placed into the IRR, which will be a no-pay/no-point status, |
| 11:14:32 | 14 | until the end of his terms of service, which I'm not sure how |
| 11:14:37 | 15 | much that was -- it's usually three to four years -- and then |
| 11:14:40 | 16 | would be separated after that with an honorable discharge. |
| 11:14:45 | 17 | THE COURT: And I'm assuming at this point in time, |
| 11:14:47 | 18 | based upon kind of the unknowns here, that there would be no |
| 11:14:50 | 19 | anticipated timing of those actions? |
| 11:14:55 | 20 | MR. CARMICHAEL: No, not yet. Sometime in March |
| 11:14:57 | 21 | probably for the IRR part. And then I would suspect that he |
| 11:15:01 | 22 | would just stay in the IRR for -- until the end of his |
| 11:15:06 | 23 | service, his obligated service. |
| 11:15:12 | 24 | THE COURT: Well, that's the plan. What could the |
| 11:15:14 | 25 | Air Force do? |

| 11:15:16 | 1 | MR. CARMICHAEL:  I mean, what could they do?  There |
| 11:15:18 | 2 | is some limitations there with -- I mean, they could actually |
| 11:15:25 | 3 | separate him, but then you would have to do particular notice |
| 11:15:30 | 4 | for separating an officer.  That hasn't been done. |
| 11:15:34 | 5 | You know, they could court-martial him, but nobody has |
| 11:15:40 | 6 | been court-martialed.  It's very unlikely that anybody would. |
| 11:15:43 | 7 | And the withholding of that is at a very high level. |
| 11:15:45 | 8 | THE COURT:  Well, getting back into the letter that |
| 11:15:47 | 9 | was received and there were questions about the threat, |
| 11:15:52 | 10 | basically that is an option, correct? |
| 11:15:54 | 11 | MR. CARMICHAEL:  Oh, yes, yes. |
| 11:15:55 | 12 | THE COURT:  Thank you.  Then -- and you will |
| 11:16:01 | 13 | probably touch on this maybe in your argument, but I just want |
| 11:16:04 | 14 | to make sure I get this.  This temporary medical |
| 11:16:15 | 15 | administrative exemption minus a religious exemption, where |
| 11:16:24 | 16 | someone is -- well, let me -- where someone's allergic to the |
| 11:16:30 | 17 | component of the vaccine, then what accommodations, to your |
| 11:16:34 | 18 | knowledge, have been made and what restrictions have been |
| 11:16:38 | 19 | imposed on that person? |
| 11:16:40 | 20 | MR. CARMICHAEL:  I do have a whole speech on that, |
| 11:16:44 | 21 | but I -- |
| 11:16:44 | 22 | THE COURT:  Somehow I knew you would. |
| 11:16:45 | 23 | MR. CARMICHAEL:  I thought that would be a major |
| 11:16:47 | 24 | area of the Court's questions.  So I can -- |
| 11:16:51 | 25 | THE COURT:  If you want to include that, just |

| 11:16:53 | 1 | address it in your presentation.  I don't want to derail you, |
| 11:16:55 | 2 | counsel.  I'm just trying to make sure that there are certain |
| 11:16:59 | 3 | points that are touched. |
| 11:17:01 | 4 | MR. CARMICHAEL:  Please, you know, interrupt me and |
| 11:17:03 | 5 | ask questions in that part as well. |
| 11:17:10 | 6 | THE COURT:  And my final question -- and then I'll |
| 11:17:13 | 7 | just turn you loose then -- in opposition's brief there have |
| 11:17:21 | 8 | been references made that service members in Lieutenant |
| 11:17:26 | 9 | Poffenbarger's unit, including reservists, must stay |
| 11:17:29 | 10 | deployment ready.  I hear that term "deployment ready."  What |
| 11:17:33 | 11 | would deployment entail for Lieutenant Poffenbarger |
| 11:17:39 | 12 | specifically? |
| 11:17:40 | 13 | MR. CARMICHAEL:  Well, you know, sometimes it's hard |
| 11:17:43 | 14 | to estimate what exactly it would be because of the changing |
| 11:17:48 | 15 | environment.  We have had -- for reservists, we called on |
| 11:17:55 | 16 | reservists heavily during Iraq and Afghanistan.  I was in |
| 11:18:00 | 17 | Afghanistan with a year -- for a year sitting across from two |
| 11:18:04 | 18 | Air Force reservists that I worked together with in Kabul.  So |
| 11:18:10 | 19 | that's likely.  It's likely he would be augmented to fill a |
| 11:18:15 | 20 | position in a war zone if it were -- luckily we -- well, we |
| 11:18:22 | 21 | don't have a war right now, so we're not talking -- but we |
| 11:18:25 | 22 | could.  We could, Your Honor. |
| 11:18:26 | 23 | THE COURT:  Do you know something that I don't know? |
| 11:18:31 | 24 | I'm sorry. |
| 11:18:32 | 25 | MR. CARMICHAEL:  But that's the sort of thing that |

11:18:33  1    we would expect.

11:18:34  2        Sometimes it could be to other bases, like one in Turkey

11:18:38  3    the Air Force goes to a lot.  So we don't really know.  It

11:18:41  4    could be in a theater.  It could be overseas on a particular

11:18:45  5    base that they go to.

11:18:50  6        And one of the keys for that is that when you do

11:18:54  7    deployments, particularly in Afghanistan, there isn't sort of

11:18:59  8    health requirement -- health facilities there available, which

11:19:03  9    is why we require things like tetanus.  It's not -- you know,

11:19:07  10   it's why also I kind of, you know, cringe a little bit when I

11:19:12  11   hear the herd immunity argument just because that doesn't make

11:19:15  12   any sense for the military.  There is no herd immunity for

11:19:19  13   tetanus, but we require it because if you get shrapnel or you

11:19:24  14   get something crushed on your foot, you can't take care of

11:19:30  15   lockjaw in theater.  So that's one of the things.

11:19:32  16            THE COURT:  Okay.  I think you've answered my

11:19:34  17   question.  I said one final question.  Now I have one final

11:19:37  18   question.

11:19:37  19       Do you agree that *Dahl* is on all fours?

11:19:41  20            MR. CARMICHAEL:  No, no, Your Honor.  I can talk

11:19:44  21   specifically about *Dahl*.

11:19:46  22            THE COURT:  Why don't you make that part of your

11:19:48  23   presentation.  I am going to let you go.

11:19:50  24            MR. CARMICHAEL:  Okay.

11:19:51  25            THE COURT:  Go ahead.

| | | |
|---|---|---|
| 11:19:52 | 1 | MR. CARMICHAEL:  Military vaccines have been -- |
| 11:19:57 | 2 | well, vaccines have been part of the military for a little |
| 11:20:00 | 3 | over 70 years, a constant part.  It is not a new thing, and |
| 11:20:07 | 4 | COVID is not a new thing.  A COVID vaccine is not a starting |
| 11:20:14 | 5 | of this new program. |
| 11:20:17 | 6 | It's had little controversy for that 70 years.  There was |
| 11:20:23 | 7 | some back in the beginning of the Gulf War when anthrax was |
| 11:20:29 | 8 | added, some in the 2000s, but religious exemptions have been |
| 11:20:33 | 9 | very sparse -- religious exemption requests have been very |
| 11:20:37 | 10 | sparse over that period. |
| 11:20:42 | 11 | But with the addition of the COVID-19 vaccine, which now |
| 11:20:45 | 12 | puts the number that a service member must get up to ten, |
| 11:20:50 | 13 | we've had -- the military's had over 21,000 requests for |
| 11:20:56 | 14 | religious exemptions for the COVID-19 vaccine alone. |
| 11:21:00 | 15 | It's surprising for -- |
| 11:21:04 | 16 | THE COURT:  How many have been granted? |
| 11:21:08 | 17 | MR. CARMICHAEL:  All together, somewhere in the |
| 11:21:09 | 18 | range of ten. |
| 11:21:11 | 19 | And they are, as counsel said, generally as I -- for |
| 11:21:17 | 20 | whatever reasons, some service members chose instead to submit |
| 11:21:22 | 21 | their terminal leave request, the admin exemptions for |
| 11:21:28 | 22 | terminal leave, they submitted it as a religious exemption |
| 11:21:31 | 23 | even though they were eligible for a terminal leave when it |
| 11:21:34 | 24 | was granted under those same administrative -- same sort of |
| 11:21:38 | 25 | factors. |

| | | |
|--|--|--|
| 11:21:41 | 1 | The vaccine program for the military is not designed to |
| 11:21:47 | 2 | end a global pandemic.  It's designed to make sure that |
| 11:21:52 | 3 | everybody in the force is deployment ready.  Everybody has to |
| 11:21:57 | 4 | have a -- to be ready to go at any time, and reservists in |
| 11:22:02 | 5 | particularly because that's the full purpose of the Reserves. |
| 11:22:06 | 6 | We have talked a lot about Lieutenant Poffenbarger's |
| 11:22:12 | 7 | specific jobs he would do as a reservist and why those going |
| 11:22:17 | 8 | into the SCIF is very important.  He could spread COVID at the |
| 11:22:24 | 9 | training for that five-month period, or that his job after, he |
| 11:22:32 | 10 | would be able to spread it there or contract it there. |
| 11:22:36 | 11 | But the main purpose of the Reserves is to be ready and |
| 11:22:41 | 12 | to be deployed at any time to those forward areas in which |
| 11:22:47 | 13 | medical care is often not available and in which it's very |
| 11:22:52 | 14 | costly to medevac somebody if they develop a condition. |
| 11:22:56 | 15 | The areas that somebody deploys to don't usually have the |
| 11:23:01 | 16 | medical capabilities to handle severe COVID, just like they |
| 11:23:07 | 17 | don't have the capabilities to handle any number of one of |
| 11:23:10 | 18 | those other ten diseases that we require service members to |
| 11:23:15 | 19 | get vaccinated for. |
| 11:23:16 | 20 | And that's why they actually call what Lieutenant |
| 11:23:21 | 21 | Poffenbarger would do on the weekends as annual training or |
| 11:23:24 | 22 | drill.  It's because you are keeping your skills current and |
| 11:23:29 | 23 | keeping your readiness current for deployment.  It really is |
| 11:23:34 | 24 | the main purpose of the Reserves. |
| 11:23:43 | 25 | For some of the legal arguments that I have seen for |

| | | |
|---|---|---|
| 11:23:46 | 1 | this, for this case, for the other cases, you know, there is |
| 11:23:52 | 2 | always a little difficulty when we have -- when we have to |
| 11:23:56 | 3 | come in and explain military deference.  That's sort of one of |
| 11:24:02 | 4 | the things I do for the Department of Justice.  I've gone |
| 11:24:05 | 5 | around the country, and sometimes I am introducing the |
| 11:24:08 | 6 | plaintiff, sometimes even the court to military deference for |
| 11:24:11 | 7 | the very first time. |
| 11:24:12 | 8 | And the standard is surprising for some folks.  For |
| 11:24:17 | 9 | plaintiffs, the plaintiffs didn't really touch on it.  They |
| 11:24:19 | 10 | cited nonmilitary cases.  But the one that is the standard for |
| 11:24:24 | 11 | deference in the military is the *Goldberg* [sic] case.  That's |
| 11:24:28 | 12 | the Supreme Court case here. |
| 11:24:31 | 13 | So I think there is a couple quotes from the *Goldberg*. |
| 11:24:35 | 14 | It really just demonstrates that the military is different; |
| 11:24:39 | 15 | that it's not something I am saying, it's something the |
| 11:24:42 | 16 | Supreme Court is saying.  So from Gold -- *Goldman*, "When |
| 11:24:45 | 17 | evaluating whether military needs justified particular |
| 11:24:49 | 18 | restriction on a religiously motivated conduct, the court must |
| 11:24:53 | 19 | give great deference to the professional judgment of military |
| 11:24:55 | 20 | authorities concerning the relative importance of a particular |
| 11:24:57 | 21 | military."  And that's from page 507. |
| 11:25:02 | 22 | And that's -- the deference is to what the military, what |
| 11:25:10 | 23 | the compelling government interest is and their way of |
| 11:25:13 | 24 | addressing it. |
| 11:25:14 | 25 | And then for *Goldman*, which, I should have said up front, |

| | | |
|---|---|---|
| 11:25:19 | 1 | is a case where a service member wanted to wear a yarmulke |
| 11:25:23 | 2 | with their unit and there was a -- there was a instruction |
| 11:25:29 | 3 | that you couldn't wear religious attire. And that was denied |
| 11:25:34 | 4 | because of good order and discipline, which I think is a less |
| 11:25:37 | 5 | compelling reason than the compelling reason we have not to |
| 11:25:41 | 6 | spread here, the spreading of disease. And the Supreme Court |
| 11:25:46 | 7 | said, "The First Amendment does not require the military to |
| 11:25:50 | 8 | accommodate such practices in the face of its view that they |
| 11:25:53 | 9 | would detract from the uniformity sought by the dress |
| 11:25:57 | 10 | regulations." |
| 11:25:58 | 11 | Here, the military has a view that -- that if this |
| 11:26:02 | 12 | service member -- and several others -- but this service |
| 11:26:04 | 13 | member in particular, we have put things for this service |
| 11:26:06 | 14 | member --  will not be deployment ready and will not be able |
| 11:26:09 | 15 | to perform his job if he does not get this vaccine. |
| 11:26:13 | 16 | I think one of the key parts that really emphasizes why |
| 11:26:18 | 17 | this is -- why this standard is different is actually in the |
| 11:26:22 | 18 | concurrence by Justice Stevens. And he says, "Because |
| 11:26:27 | 19 | professionals in military service attach great importance, |
| 11:26:31 | 20 | such great importance to the plausible interest, it is one we |
| 11:26:35 | 21 | must recognize as legitimate and rational even though personal |
| 11:26:39 | 22 | experience or admiration for the performance of the ragtag |
| 11:26:43 | 23 | band of soldiers that won us our freedom in the Revolutionary |
| 11:26:48 | 24 | War might persuade us that the government has exaggerated that |
| 11:26:51 | 25 | important -- the importance of that interest." |

11:26:54  1      "Plausible and rational" are not the words that you hear

11:27:02  2   when talking about your regular First Amendment case, or your

11:27:08  3   regular RFRA case, and something that says even you defer to

11:27:13  4   it, even though we might think the government exaggerated the

11:27:16  5   importance of that interest.  It just shows that it is a

11:27:20  6   different standard.

11:27:24  7      And courts often -- plaintiffs often come in and say,

11:27:31  8   okay, don't apply that standard because if you do, it is very

11:27:34  9   hard for a plaintiff to win.  We know that.  I mean, that's

11:27:38  10  the standard that they have set.  It is very hard for a

11:27:40  11  plaintiff to win under that standard.

11:27:43  12     And in the transgender military service cases, which I

11:27:49  13  handle those as well, we lost four times in the district

11:27:54  14  court, four district courts.  Each district court said that

11:27:59  15  the military deference standard doesn't apply for whatever

11:28:01  16  reason, you know.  They had various reasons.  Then we won

11:28:09  17  across the board on the appellate courts because the appellate

11:28:12  18  court said you didn't apply the right standard.  You have to

11:28:16  19  apply a military deference, the military's explanation as

11:28:20  20  plausible.

11:28:26  21     That is -- that's the exact mistake that the three cases

11:28:28  22  that have not joined the military have made.  They have not

11:28:31  23  applied the right standard.  They will get reversed on appeal.

11:28:34  24  I am -- I am very confident that they will get reversed on

11:28:37  25  appeal because they applied the wrong military standard.

11:28:40  1      Here, the Court -- or the plaintiffs are asking this

11:28:42  2  Court to apply the wrong legal standard.  So for *Dahl*, *Dahl* is

11:28:49  3  a nonmilitary case, so it's not on all fours for that reason.

11:28:54  4  But *Dahl* really doesn't advance the ball for plaintiffs at

11:28:58  5  all.  Most of the arguments we didn't even make here in the

11:29:05  6  military.  I obviously think like for *Dahl* you can just skip

11:29:09  7  to part C of the opinion because A and B don't really apply.

11:29:16  8      And then -- then we just go to what was -- what little

11:29:21  9  the university advanced.  They actually specifically say,

11:29:26 10  "Defendants presented no evidence as to a compelling interest

11:29:31 11  as to that -- these particular plaintiffs."  We presented lots

11:29:36 12  of evidence as to this particular plaintiff.  So that was the

11:29:42 13  reason they rejected it in *Dahl*, because there was no evidence

11:29:44 14  presented.  And that doesn't really apply here.

11:29:47 15      In fact, *Dahl* does ensure that this Court cannot follow

11:29:52 16  the Texas case because the Texas case found that the Navy does

11:30:00 17  not have a compelling interest in vaccinating service members.

11:30:05 18  But *Dahl* specifically says that they do not dispute that the

11:30:08 19  university had a compelling interest in vaccinating athletes

11:30:14 20  or students.

11:30:18 21      They did have a problem that there was no evidence as

11:30:19 22  to -- presented why they had to vaccinate those particular

11:30:23 23  athletes or as to why it was only athletes and not the school

11:30:28 24  in general.  Here, that issue is not on the table because we

11:30:34 25  are asking the entire military to be vaccinated.

11:30:39  1        So now let's turn to medical and admin exemptions.  And I

11:30:46  2    think there are -- there is definitely things in the record

11:30:48  3    for that, and I can point the Court to it.

11:30:53  4        So the instruction is in the record as 22, tack 6 on the

11:31:07  5    docket.  So you may not have that, but hopefully it's -- it's

11:31:18  6    on the docket, but the specific pages I would point the Court

11:31:22  7    to are pages 13 and 14 of 22, tack 6, and page 35 and 36 of

11:31:27  8    22, tack 6.  And this is the instruction that specifically

11:31:33  9    explains what medical exemptions and what administrative

11:31:37  10   exemptions are.

11:31:39  11       So I'll start with the administrative exemptions.  Those

11:31:46  12   are -- those are a bit easier to explain.  Administrative

11:31:50  13   exemptions, there is a chart on page 35 that shows what they

11:31:52  14   are.  They are all limited duration.  They can't last more

11:31:57  15   than 180 days.  And the Air Force -- and we also have the

11:32:01  16   declaration from Lieutenant Colonel Little -- explains that

11:32:03  17   they have been giving them to -- with just 22, tack 16, that

11:32:08  18   explains that they have been giving them for folks on terminal

11:32:12  19   leave.

11:32:13  20       And terminal leave is something in the military where you

11:32:21  21   generally transfer over 90 days of leave a year.  Since you

11:32:26  22   accrue leave while you are on leave, you can end up with 120

11:32:29  23   days of terminal leave.  And that is -- I mean, I took it when

11:32:34  24   I got out of the military.  I think I accrued 90, and I

11:32:37  25   started at DOJ while I was still getting paid and still on

11:32:41   1    active duty at the -- from the Navy.

11:32:43   2      And you actually -- I left the office. You're not

11:32:47   3    deployable anymore. And the Air Force did not find that it

11:32:52   4    had a need to have people that were leaving the service and

11:32:56   5    weren't coming into the office anymore, weren't being

11:32:59   6    deployable anymore to have them get the vaccine.

11:33:04   7      Very different circumstance than Mr. -- than Lieutenant

11:33:07   8    Poffenbarger who is looking to start a career. He is looking

11:33:10   9    to start a new career. He is not at the very end. He wants

11:33:14  10    to go to a five -- a five- to six-month course, which is

11:33:18  11    almost twice as long as the terminal leave time that

11:33:22  12    individuals have, and he wants to go into a position where the

11:33:25  13    main job is to be deployable. So admin exemptions are quite

11:33:41  14    different.

11:33:44  15      The medical exemptions are quite different as well.

11:33:47  16    There is also -- so we have that again in two spots. So the

11:33:48  17    medical exemptions are the same pages that I have you go to

11:33:51  18    for the actual instruction, and it's docket 22, tack 6, page

11:33:55  19    13, and explains generally what they -- what they are. So

11:34:02  20    for -- and they give examples: immune competence,

11:34:06  21    pharmacological radiation therapy, pregnancy, adverse --

11:34:10  22    adverse reactions are the ones, the examples that they give in

11:34:17  23    there.

11:34:17  24      And then on 22, tack 2, Colonel Chapa kind of says

11:34:24  25    basically the same thing, that that's what they are for. We

| | | |
|---|---|---|
| 11:34:31 | 1 | have done -- in some of the other cases, we have done a |
| 11:34:33 | 2 | breakdown in trying to see where those are coming from. They |
| 11:34:40 | 3 | are overwhelmingly pregnancy. So that is -- it is a |
| 11:34:46 | 4 | significant difference from Lieutenant Poffenbarger's |
| 11:34:49 | 5 | condition. He's not pregnant. A pregnant person is going to |
| 11:34:56 | 6 | be required -- expected to get the vaccine as soon as they are |
| 11:35:01 | 7 | not pregnant, and go back into a deployable status. |
| 11:35:05 | 8 | THE COURT: So what happens prior to that? So what |
| 11:35:08 | 9 | happens? |
| 11:35:08 | 10 | MR. CARMICHAEL: So if they are pregnant? So they |
| 11:35:12 | 11 | will go in -- so they -- you are having regular meetings with |
| 11:35:15 | 12 | your OB/GYN. You ask for a exemption and your OB gives that |
| 11:35:29 | 13 | to you, but there is a Department of Defense policy that says |
| 11:35:32 | 14 | you have to get the vaccine within two weeks of the pregnancy |
| 11:35:37 | 15 | ending. So it's a temporary exemption for the pregnancy. |
| 11:35:40 | 16 | Some OBs are -- are granting them. |
| 11:35:43 | 17 | But those -- if you actually look at the numbers, the |
| 11:35:46 | 18 | numbers are going down consistently. Every week when -- when |
| 11:35:51 | 19 | we're doing that in the Florida case, every two weeks they |
| 11:35:57 | 20 | would go down because we are past the deadline for getting |
| 11:35:58 | 21 | them. So all we see is them expiring at this point. |
| 11:36:02 | 22 | And we expect within nine months that most pregnancy ones |
| 11:36:05 | 23 | will be gone. And within a year, almost all medical |
| 11:36:09 | 24 | exemptions will be gone. And the reason for that is even if |
| 11:36:12 | 25 | you are a person that has one of these other conditions -- you |

| | | |
|---|---|---|
| 11:36:16 | 1 | know, let's say cancer is another one, or cancer, radiation, a |
| 11:36:21 | 2 | lot of times they don't advise getting a vaccine while you are |
| 11:36:25 | 3 | taking radiation -- if you are nondeployable for a year, if |
| 11:36:30 | 4 | you are active duty, they move to separate you, give you a |
| 11:36:34 | 5 | medical board.  If you are in the Reserves, they move you to |
| 11:36:37 | 6 | the IRR.  It's the same exact things that the Air Force is |
| 11:36:42 | 7 | doing -- wants to do to Second Lieutenant Poffenbarger. |
| 11:36:44 | 8 | That's what would happen to a medical exemption if they can't |
| 11:36:48 | 9 | become deployable.  Because the purpose of the program is to |
| 11:36:52 | 10 | get somebody back to a deployable status. |
| 11:36:56 | 11 | THE COURT:  Now, those medical -- those medical |
| 11:37:08 | 12 | exemptions focus on the health of the individual, correct? |
| 11:37:11 | 13 | MR. CARMICHAEL:  Yes. |
| 11:37:12 | 14 | THE COURT:  It's a different thing here we're |
| 11:37:16 | 15 | talking with regard to Lieutenant Poffenbarger? |
| 11:37:20 | 16 | MR. CARMICHAEL:  I would say the military has an |
| 11:37:22 | 17 | interest in both, right?  I mean, so -- and the military's |
| 11:37:25 | 18 | interest is served in both of these things.  One is the health |
| 11:37:27 | 19 | of the individual, and from Lieutenant Poffenbarger and for |
| 11:37:32 | 20 | those around it.  And in these cases, the health of the |
| 11:37:37 | 21 | individual is also served through these medical exemptions. |
| 11:37:41 | 22 | And I would say what is the rare case is the adverse |
| 11:37:44 | 23 | reaction one.  Those are -- the Air Force has not granted any |
| 11:37:46 | 24 | permanent medical exemptions but the Army has.  And you saw |
| 11:37:52 | 25 | that number, I think it was five, the last one we did.  And |

| | | |
|---|---|---|
| 11:37:55 | 1 | every single one of those was somebody that had an adverse |
| 11:37:58 | 2 | reaction to the shot.  So, one, they had some antibodies from |
| 11:38:03 | 3 | the first shot, but they went into anaphylaxis or they got |
| 11:38:07 | 4 | some -- an issue, myocarditis.  In that case not giving them |
| 11:38:12 | 5 | the second shot is better for their health.  It would harm |
| 11:38:15 | 6 | them to give them a second shot.  And so in both cases the |
| 11:38:20 | 7 | military has made a determination that it is for the health of |
| 11:38:26 | 8 | the person to actually give that medical exemption. |
| 11:38:30 | 9 | THE COURT:  Any other kind of example with regard to |
| 11:38:36 | 10 | a communicable disease or communicable illness? |
| 11:38:40 | 11 | MR. CARMICHAEL:  That the military does?  The flu |
| 11:38:42 | 12 | shot.  The military requires an annual flu shot. |
| 11:38:44 | 13 | THE COURT:  No.  What I mean, as to an exemption, a |
| 11:38:47 | 14 | medical exemption.  Let's deal with the facts.  I mean, we are |
| 11:38:50 | 15 | asking here were a medical exemption to -- because of not only |
| 11:38:53 | 16 | a concern for the individual, but concern for those around |
| 11:38:56 | 17 | him, or her. |
| 11:39:01 | 18 | MR. CARMICHAEL:  For medical.  So medical is for the |
| 11:39:04 | 19 | individual with the goal of getting the person back to a |
| 11:39:11 | 20 | deployable status within a year because there is that kind of |
| 11:39:14 | 21 | time line where we have to try to separate you within a year. |
| 11:39:17 | 22 | And then the -- except for those rare cases where you get the |
| 11:39:21 | 23 | permanent one, and that's for the health of the individual not |
| 11:39:24 | 24 | to give them.  They will still have to get re-evaluated.  In |
| 11:39:27 | 25 | the Air Force they have to get re-evaluated every year.  In |

| | | |
|---|---|---|
| 11:39:30 | 1 | the Army they have to get re-evaluated every five years. |
| 11:39:35 | 2 | Your Honor, do you have anymore questions about medical |
| 11:39:38 | 3 | or admin exemptions? |
| 11:39:41 | 4 | THE COURT: Hold on a second. |
| 11:39:47 | 5 | (Pause.) |
| 11:40:44 | 6 | THE COURT: Sorry, counsel. I have no other |
| 11:40:47 | 7 | questions. Go ahead. |
| 11:40:48 | 8 | MR. CARMICHAEL: Yes, Your Honor. I would -- I |
| 11:40:50 | 9 | would want to -- there was one issue there, and this was |
| 11:40:53 | 10 | the -- with the Texas courts I think made a mistake on is that |
| 11:40:59 | 11 | if you get a medical exemption, that doesn't mean that you are |
| 11:41:04 | 12 | deployable. It doesn't mean you are going in and being around |
| 11:41:05 | 13 | the Force. That was one that we specifically pointed out. |
| 11:41:10 | 14 | The Court said we were treating special operators |
| 11:41:15 | 15 | differently because we were allowing people with medical |
| 11:41:19 | 16 | exemptions to deploy but we are not allowing people with |
| 11:41:23 | 17 | religious exemptions to deploy. That's not correct. We |
| 11:41:30 | 18 | weren't allowing people with medical exemptions to be special |
| 11:41:31 | 19 | operators. They were taken out of the career field. And we |
| 11:41:34 | 20 | pointed that out to the court. I don't know how that's been |
| 11:41:39 | 21 | worked out on the appeal. That was not a basis of the court's |
| 11:41:40 | 22 | findings. |
| 11:41:43 | 23 | Moving to the -- moving to the other factors briefly. |
| 11:41:52 | 24 | Getting transferred to the IRR is not irreparable harm. We -- |
| 11:41:57 | 25 | I mean, we hope Second Lieutenant Poffenbarger does come back. |

| | | |
|---|---|---|
| 11:42:03 | 1 | You know, he said that he won't take the -- any current |
| 11:42:08 | 2 | version of the vaccine.  If he changes his mind, you know, |
| 11:42:15 | 3 | we'll welcome him back or maybe if another one comes out he |
| 11:42:19 | 4 | can return back, and that's the whole purpose of the IRR is he |
| 11:42:27 | 5 | can return back.  So that's not irreparable harm. |
| 11:42:30 | 6 | And the -- and sort of the line that even if that's a |
| 11:42:34 | 7 | constitutional infringement of rights for even a second |
| 11:42:38 | 8 | because a lot that is going to -- interesting plaintiffs make |
| 11:42:42 | 9 | that argument for irreparable harm because they can't meet the |
| 11:42:47 | 10 | employment irreparable harm.  Well, that doesn't -- you can't |
| 11:42:51 | 11 | meet that standard if the military is justified in actually |
| 11:42:55 | 12 | taking the action as it is here, and like the *Goldberg* -- *the* |
| 11:43:02 | 13 | *Goldman* case was. |
| 11:43:04 | 14 | And the balance of equities are strongly in favor of the |
| 11:43:08 | 15 | military.  Let's not forget the plaintiff did ask to have the |
| 11:43:15 | 16 | court grant 10,000 religious exemptions, which is clearly -- |
| 11:43:26 | 17 | that would be very strong in favor of the military for |
| 11:43:29 | 18 | granting that and granting relief for people that are not in |
| 11:43:32 | 19 | front of the court. |
| 11:43:34 | 20 | But even as to plaintiff -- to the plaintiff, sending him |
| 11:43:40 | 21 | to the school and having him exposed to other students or |
| 11:43:45 | 22 | sending him into the unit is still the balance of equities |
| 11:43:50 | 23 | still tip in favor of the military.  And even having him in |
| 11:43:53 | 24 | the reserve unit where he is not qualified to deploy, somebody |
| 11:43:58 | 25 | else might have to deploy in his spot. |

| 11:44:00 | 1 | I mean, I don't know exactly the way the Air Force works. |
| 11:44:06 | 2 | I do know the way the Navy works for that.  I mean, there is a |
| 11:44:09 | 3 | random pool, and everybody is in it.  And if you are not |
| 11:44:12 | 4 | available to be deployed, that's one -- one less person that's |
| 11:44:16 | 5 | in the Reserves and is not deployable, one less shot that |
| 11:44:21 | 6 | everybody else deploys, which is a fundamental unfairness to |
| 11:44:25 | 7 | the other folks. |
| 11:44:26 | 8 | Unless the Court has any further questions, thank you. |
| 11:44:32 | 9 | THE COURT:  No, I don't.  Thank you. |
| 11:44:33 | 10 | Counsel? |
| 11:44:37 | 11 | MR. WIEST:  Just very briefly to wrap up, Your |
| 11:44:41 | 12 | Honor, I wanted to address because what I heard, and I frankly |
| 11:44:44 | 13 | heard it a lot in the last two years with Mr. Bruns' and I's |
| 11:44:51 | 14 | COVID litigations, we litigated -- it's kind of interesting |
| 11:44:55 | 15 | where we get to litigate the cases you cite, and we have got |
| 11:44:59 | 16 | to do that in this case.  We have litigated the *Roberts* case |
| 11:45:02 | 17 | to the Sixth Circuit; we have litigated other cases. |
| 11:45:05 | 18 | What I heard the defendants argue is that they are |
| 11:45:07 | 19 | entitled to deference, so much deference, in fact, that they |
| 11:45:11 | 20 | get to run roughshod over the Constitution, or at least it's |
| 11:45:15 | 21 | fuzzy or maybe it sleeps or it naps during a pandemic.  I |
| 11:45:20 | 22 | think the Sixth Circuit addressed that in the *Roberts* case. |
| 11:45:24 | 23 | But, Your Honor, I wanted to address the *Goldman* case and |
| 11:45:27 | 24 | the Sixth Circuit's treatment of that case in *Hartmann versus* |
| 11:45:31 | 25 | *Stone* on this deference issue.  That was a case where truly |

| | | |
|---|---|---|
| 11:45:37 | 1 | there was a neutral and generally applicable requirement. In |
| 11:45:42 | 2 | other words, the uniform requirements applied to everyone. It |
| 11:45:48 | 3 | was not an exception-ridden policy with individualized |
| 11:45:53 | 4 | exemptions. |
| 11:45:54 | 5 | And I wanted to point the Court to *Hartmann versus Stone*. |
| 11:45:56 | 6 | This is the Sixth Circuit's discussion of deference in terms |
| 11:45:59 | 7 | of the military, in terms of that very observation. And this |
| 11:46:03 | 8 | is -- the pin cite on this is 68 F.3d at 985. Quote, "Those |
| 11:46:11 | 9 | religiously offensive regulations to which the court has |
| 11:46:14 | 10 | deferred appear to have always been, on their face, neutral |
| 11:46:17 | 11 | and generally applicable." |
| 11:46:19 | 12 | Your Honor, we are not dealing with that here. We are |
| 11:46:20 | 13 | dealing with individualized exemptions that the U.S. Supreme |
| 11:46:24 | 14 | Court has already indicated in *Fulton,* perhaps again in |
| 11:46:28 | 15 | *Tandon,* when we are dealing with these exemptions because they |
| 11:46:31 | 16 | are granting medical and administrative exemptions. It's not |
| 11:46:36 | 17 | neutral and generally applicable. In other words, it's not |
| 11:46:40 | 18 | the case that every single person in the entire Air Force has |
| 11:46:42 | 19 | to be vaccinated or else they are out. Right? That would be |
| 11:46:45 | 20 | a different case, and I know we made that point in our moving |
| 11:46:49 | 21 | papers. So we know that that's not the case. |
| 11:46:51 | 22 | And we know also that they have granted medical |
| 11:46:53 | 23 | exemptions for folks with allergies to the medical components. |
| 11:46:57 | 24 | Those aren't temporary in nature. Those are actually |
| 11:47:00 | 25 | permanent. If you look at Colonel Holbrook's declaration, he |

11:47:04  1    indicates that.

11:47:07  2         I wanted to just address a couple other points.

11:47:10  3         Your Honor, if Congress wanted to draft a statute to

11:47:13  4    exempt out military from RFRA's applicability, they know

11:47:18  5    exactly how to do that.  And, in fact, they did some of that

11:47:21  6    to exempt out federal prisoners in the Prison Litigation

11:47:27  7    Reform Act.  I'm sure the Court's probably aware of that.

11:47:29  8    There's -- Congress knows how to write a statute.

11:47:33  9         And by the way, there is some relatively recent authority

11:47:38  10   from the D.C. District Court -- I know we cite it in our

11:47:41  11   moving papers -- *Singh versus McHugh*, that talks about this

11:47:45  12   deference issue.  That's 109 F. Supp 3d 72.

11:47:47  13        You know, when we are dealing with RFRA, it's not just

11:47:50  14   anything the government wants goes.  There is a standard here.

11:47:55  15   And unfortunately for the government, when they are granting

11:47:59  16   robust numbers of albeit perhaps temporary -- I mean, maybe we

11:48:03  17   will have to take their word on that -- not all of them are

11:48:07  18   temporary, by the way.  Colonel Holbrook's declaration, I

11:48:10  19   think in the Florida case, reveals that some of them are

11:48:14  20   permanent exemptions for those that have the reactions that

11:48:16  21   government counsel indicated that, you know, when you get the

11:48:18  22   first shot and something really bad happens, you know, before

11:48:21  23   you get number two.  No, that's a permanent exemption.  And,

11:48:24  24   yes, there is a handful of those, and those aren't the

11:48:27  25   thousands that have been granted.

| | | |
|---|---|---|
| 11:48:28 | 1 | But the declaration is also clear that they renewed those |
| 11:48:33 | 2 | medical exemptions, and they continue to roll them out. And |
| 11:48:37 | 3 | part of the reason that they do that, Your Honor, is that if |
| 11:48:39 | 4 | somebody's got an allergy, well, maybe there is a new product |
| 11:48:43 | 5 | that will come out six months from now or a year from now that |
| 11:48:46 | 6 | won't have those same ingredients. |
| 11:48:48 | 7 | Maybe, Your Honor, if somebody's got a religious |
| 11:48:52 | 8 | objection to aborted fetal tissue, there is a product that |
| 11:48:55 | 9 | comes out in six months or a year from now, that if you |
| 11:48:55 | 10 | granted a temporary religions exemption, that wouldn't have |
| 11:48:55 | 11 | the same problem. And so I think when we look at that there |
| 11:49:00 | 12 | is a disparate treatment and there is a double standard that's |
| 11:49:03 | 13 | going on. |
| 11:49:05 | 14 | I didn't hear government counsel indicate whether or not |
| 11:49:08 | 15 | people could be deployed without a vaccine with a medical |
| 11:49:11 | 16 | exemption. I am not sure I ever heard the answer to that. I |
| 11:49:14 | 17 | think that that's an important question, because we just heard |
| 11:49:16 | 18 | about deployment, deployment, deployment. |
| 11:49:18 | 19 | But, again, the evidence that's been put on is the ops |
| 11:49:22 | 20 | tempo hasn't declined during COVID. The Air Force's ability |
| 11:49:26 | 21 | to accomplish its mission hasn't declined during COVID. They |
| 11:49:31 | 22 | have been able to do that from March of 2020 through September |
| 11:49:34 | 23 | of 2021. |
| 11:49:35 | 24 | And, yes, vaccines are a wonderful piece of new modern |
| 11:49:41 | 25 | technology, but we didn't have them for a year and a half in |

| | | |
|---|---|---|
| 11:49:44 | 1 | the pandemic and life went on. And so this notion that it's |
| 11:49:48 | 2 | absolutely critical is belied not only by this past history |
| 11:49:51 | 3 | but again the robust numbers of the medical and administrative |
| 11:49:57 | 4 | exemptions. |
| 11:49:58 | 5 | Your Honor, I did just want to finish with *Goldman versus* |
| 11:50:01 | 6 | *Weinberger*. That was again a dress standard and was a neutral |
| 11:50:07 | 7 | and generally applicable regulation. And, you know, deference |
| 11:50:13 | 8 | out, you know, out of the room in terms of neutral and |
| 11:50:16 | 9 | generally applicable regulations, if this were a vaccine |
| 11:50:20 | 10 | mandate that applied to every single Airman in the entire Air |
| 11:50:24 | 11 | Force and Space Force with no exemptions whatsoever, I don't |
| 11:50:28 | 12 | think we'd have much of a case. But the thousands of |
| 11:50:30 | 13 | administrative and medical exemptions frankly demonstrate |
| 11:50:34 | 14 | otherwise. |
| 11:50:37 | 15 | If the Court has no further questions, Your Honor? |
| 11:50:37 | 16 | THE COURT: Thank you. |
| 11:50:46 | 17 | Okay. Counsel, I appreciate, one, your briefing. I |
| 11:50:54 | 18 | appreciate your presentations. I appreciate your hard work. |
| 11:50:59 | 19 | The Court will get to work and will issue a decision as |
| 11:51:08 | 20 | quickly as we can. I know we were working with maybe some |
| 11:51:13 | 21 | timelines here, but we will try to get something on as quickly |
| 11:51:16 | 22 | as we can. |
| 11:51:17 | 23 | Anything further, counsel? |
| 11:51:20 | 24 | MR. WIEST: No, Your Honor. |
| 11:51:22 | 25 | THE COURT: Counsel? |

11:51:23   1               MR. CARMICHAEL:  No, Your Honor.

11:51:23   2               THE COURT:  Again, thank you very much.

11:51:25   3               THE COURTROOM DEPUTY:  All rise.  This court stands

11:51:28   4       in recess.

11:51:28   5           (Proceedings concluded at 11:51 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF REPORTER

2

3          I, Mary A. Schweinhagen, Federal Official Realtime

4    Court Reporter, in and for the United States District Court

5    for the Southern District of Ohio, do hereby certify that

6    pursuant to Section 753, Title 28, United States Code that the

7    foregoing is a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter and that the transcript page format is

10   in conformance with the regulations of the Judicial Conference

11   of the United States.

12

13   s/Mary A. Schweinhagen

14   _____ 3rd of March, 2022

15   MARY A. SCHWEINHAGEN, RDR, CRR
     FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25